No. 22-5843

UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

THOMAS HOUSE, ET AL.,

*Plaintiffs-Appellees*

v.

PLAYERS' DUGOUT, INC., ET AL.

*Defendants-Appellants*

On Appeal from the United States District Court
for the Western District of Kentucky
Case No. 3:16-cv-00594

**BRIEF OF APPELLANTS**

Michael P. Abate
Burt A. (Chuck) Stinson
KAPLAN JOHNSON ABATE & BIRD LLP
710 West Main Street, Suite 400
Louisville, KY 40202
Telephone: (502) 416-1630
mabate@kaplanjohnsonlaw.com
cstinson@kaplanjohnsonlaw.com

**DISCLOSURE OF CORPORATE AFFILIATIONS AND FINANCIAL INTEREST**

Sixth Circuit Case No.: 22-5843

Case Name: <u>Thomas House, et al. v. Players' Dugout, Inc., et al.</u>

Name of counsel: <u>Michael P. Abate</u>

Pursuant to 6th Cir. R. 26.1, Players' Dugout, Inc. makes the following disclosure:

1.   Is said party a subsidiary or affiliate of a publicly-owned corporation?

     Response: <u>No.</u>

2.   Is there a publicly-owned corporation, not a party to the appeal, that has a financial interest in the outcome?

     Response: <u>No.</u>

<u>*/s/  Michael P. Abate*</u>                    Dated: November 30, 2022
Michael P. Abate
*Counsel for Appellant*

i

# TABLE OF CONTENTS

Disclosure of Corporate Affiliations and Financial Interest............................ i

Table of Contents ...................................... ii

Table of Authorities ...................................... iv

Statement Regarding Oral Argument .................................... ix

Jurisdictional Statement ...................................... 1

Statement of the Issues on Appeal .................................... 1

Statement of the Case ...................................... 2

I.   Factual Background...................................... 2

    A. The PAJTT Program .................................... 4

    B. Stevie Delabar ...................................... 5

    C. Velocity Plus Arm Care .................................... 7

    D. The License Agreement .................................... 10

    E. Royalties and Pirates .................................... 11

    F. Baseball Express .................................... 15

    G. Defamatory Statements about Players' Dugout .................................... 16

    H. Missed Royalty Checks.................................... 19

    I.  Players' Dugout Goes Under .................................... 20

  II. Procedural Background.................................... 21

Summary of the Argument .................................... 22

Argument.................................... 25

I.   The Damages Award for Trademark Infringement and Unfair
Competition Must Be Reversed.................................... 25

    A. Plaintiffs Failed to Satisfy their Burden of Showing Lost Profits
Attributable to the Alleged Infringement and Unfair Competition. . 25

    B. The Trial Court Erred in Failing to Reduce Damages Award
Under § 1117(a) to Ensure that It Was Not Excessive.................... 32

    C. The Inflated Trademark Damages Award Resulted from
Improper Surprise Testimony .................................... 35

II. The Punitive Damages and Fee Awards for Plaintiffs' State-Law Trademark and Unfair-Competition Claims Are Tainted by a Fatally Flawed Punitive Damages Jury Instruction. ............................................. 41

    A. The Punitive Damages Instruction Omitted the Required "Clear and Convincing" Evidence Standard................................... 41

    B. The Punitive Damages Award is Constitutionally Excessive........... 44

III. House Is Liable for Breach of the License Agreement, and Players' Dugout Is Not. ............................................................. 47

    A. House Breached the Agreement First. ............................................ 47

    B. Players' Dugout Did Not Waive the Breach................................... 51

IV. The Jury Should Have Been Permitted to Hold House Personally Liable for Defamation................................................................. 52

    A. House Ratified the NPA's Defamatory Communication. .............. 52

    B. The District Court Should Have Included a Jury Instruction on the Question of House's Liability for Slander *Per Se*. ............................ 55

Conclusion................................................................................... 57

Certificate of Compliance

Certificate of Service

Addendum

TABLE OF AUTHORITIES

## Cases

*Advanced Training Grp. Worldwide v. Proactive Techs.*,
  2020 WL 4574493 (E.D. Va. Aug. 7, 2020) ................................... 36, 39, 40

*Aecom Energy & Constr. v. Morrison Knudsen Corp.*,
  851 F. App'x 20 (9th Cir. 2021) ................................................................. 31

*Bentley v. Clisso*, 89 F.3d 832 (6th Cir. 1996) ................................................. 42

*Bessemer Lake Erie v. Seaway Marine Trans*,
  596 F.3d 357 (6th Cir. 2010) ..................................................................... 36

*Big Lots Stores, Inc. v. Luv n' Care, Ltd.*,
  302 F. App'x 423 (6th Cir. 2008) ............................................................... 36

*Breaking the Chain Found., Inc. v. Capitol Educ. Support, Inc.*,
  625 F. Supp. 2d 1 (D.D.C. 2009) ........................................................... 33, 34

*Brooks v. Toyotomi Co.*,
  86 F.3d 582 (6th Cir.1996) ........................................................................ 25

*Carter-Jones Lumber Co. v. Dixie Distributing*,
  166 F.3d 840 (6th Cir. 1999) ..................................................................... 33

*Cernelle v. Graminex, LLC*,
  2022 WL 2759867 (6th Cir. July 14, 2022 ................................................ 25

*CollegeNET, Inc. v. XAP Corp.*,
  483 F. Supp. 2d 1058 (D. Or. 2007) .......................................................... 32

*D'Pergo Custom Guitars, Inc. v. Sweetwater Sound, Inc.*,
  516 F. Supp. 3d 121 (D.N.H. 2021) ........................................................... 31

*Disabled American Veterans v. Crabb*,
  182 S.W.3d 541 (Ky. Ct. App. 2005) ......................................................... 56

*Duncan v. Stuetzle*,
  76 F.3d 1480 (9th Cir. 1996) ..................................................................... 46

*DXS, Inc. v. Siemens Medical Systems., Inc.*,
  100 F.3d 462 (6th Cir. 1996) ..................................................................... 38

*Eifler v. Greenamyer*,
  2019 WL 2712618 (Ky. Ct. App. June 28, 2019),
  *review denied* (Sept. 16, 2020) ........................................................ 41, 42, 43

*Fastenal Co. v. Crawford*,
  609 F. Supp. 2d 650 (E.D. Ky. 2009) ....................................................... 47

*Frisch's Restaurants v. Elby's Big Boy,*
  849 F.2d 1012 (6th Cir. 1988) ................................................................. 29

*Fryman v. Federal Crop Ins. Corp.*,
  936 F.2d 244 (6th Cir. 1991) ................................................................... 43

*Gould Paper Corp. v. Madisen Corp.*,
  614 F. Supp. 2d 485 (S.D.N.Y. 2009) ....................................................... 41

*Hall v. Rowe*,
  439 S.W.3d 183 (Ky. Ct. App. 2014) ........................................................ 50

*Hardin v. Savageau*,
  906 S.W.2d 356 (Ky. 1995) ................................................................ 42, 43

*Harrod Concrete and Stone Co. v. Melton*,
  2007 WL 3121282 (Ky. App. Oct. 26, 2007) ............................................. 42

*Hisrich v. Volvo Cars of North America., Inc.*,
  226 F.3d 445 (6th Cir. 2000) ................................................................... 52

*Ivey v. Wilson*,
  832 F.2d 950 (6th Cir. 1987) ................................................................... 55

*Kidis v. Reid*,
  976 F.3d 708 (6th Cir. 2020) ....................................................... 44, 45, 46

*Kindred Nursing Centers Ltd. P'ship v. Brown*,
  411 S.W.3d 242 (Ky. Ct. App. 2011) ........................................................ 53

*La Quinta Corp. v. Heartland Properties LLC*,
  603 F.3d 327 (6th Cir. 2010) ................................................................... 32

*Lewis v. City of Irvine,*
  899 F.2d 451 (6th Cir.1990) .................................................................... 47

*Loggins v. Franklin Cty., Ohio*,
218 F. App'x 466 (6th Cir. 2007)................................................................ 36

*Max Rack, Inc. v. Core Health & Fitness, LLC*,
40 F.4th 454 (6th Cir. 2022), *reh'g denied*,
2022 WL 3237492 (6th Cir. Aug. 10, 2022) ....................................25, 30, 32

*Moore v. Asente*,
110 S.W.3d 336 (Ky. 2003) ..................................................................... 51

*Myklatun v. Halliburton Energy Servs., Inc.*,
2011 WL 4916577 (W.D. Okla. Oct. 17, 2011)......................................... 39

*Nash-Finch Co. v. Casey's Foods, Inc.*,
762 F. App'x 218 (6th Cir. 2018).............................................................. 50

*On Davis v. Gap, Inc.*,
246 F.3d 152 (2d Cir. 2001) ..................................................................... 31

*Osborne v. Keeney*,
399 S.W.3d 1 (Ky. 2012) .......................................................................... 43

*Pennsylvania Iron Works Co. v. Henry Vogt Mach. Co.*,
96 S.W. 551 (1906) ................................................................................... 53

*Rainey v. Wayne State University*,
26 F. Supp. 2d 963 (E.D. Mich. 1998)...................................................... 30

*Robinson v. Beard*,
2017 WL 3498755 (Ky. Ct. App. July 28, 2017) ....................................... 51

*S.C. Johnson & Son, Inc. v. Nutraceutical Corp.*,
2019 WL 1320313 (E.D. Wis. Mar. 22, 2019) .......................................... 34

*Saint Joseph Healthcare, Inc. v. Thomas*,
487 S.W.3d 864 (Ky. 2016)....................................................................... 53

*Sands, Taylor Wood Co. v. Quaker Oats Co.*,
978 F.2d 947 (7th Cir. 1992) .................................................................... 33

*Scheel v. Harris*,
2012 WL 3879279 (E.D. Ky. Sept. 6, 2012).........................................36, 40

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
  538 U.S. 408 (2003) ...................................................................44, 45

*Stringer v. Wal-Mart Stores, Inc.*,
  151 S.W.3d 781 (Ky. 2005) ...................................................... 55

*Taylor v. Meirick*,
  712 F.2d 1112 (7th Cir. 1983) ................................................. 30

*Taylor v. Thomas*,
  624 F. App'x 322 (6th Cir. 2015)............................................. 35

*Timber Products Inspection, Inc. v. Coastal Container Corp.*,
  827 F. Supp. 2d 819 (W.D. Mich. 2011)................................... 29

*Toth v. Grand Trunk Railroad*, 306 F.3d 335
  (6th Cir. 2002) ........................................................................ 36

*United States v. Lawrence*,
  555 F.3d 254 (6th Cir. 2009) ................................................... 32

*United States v. Triana*,
  468 F.3d 308 (6th Cir. 2006) ................................................... 57

*White v. Steele*,
  629 F. App'x 690, 8 (6th Cir. 2015)......................................... 57

*Williams v. Nashville Network*,
  132 F.3d 1123 (6th Cir. 1997) ................................................. 47

*Wonderfoil, Inc. v. Russell*,
  630 S.W.3d 706 (Ky. 2021)...................................................... 49

*Workman v. Frito-Lay, Inc.*,
  165 F.3d 460 (6th Cir. 1999) ................................................... 25

**Statutes**

15 U.S.C. § 1117(a) ............................................................. passim

28 U.S.C. § 1291 ........................................................................ 1

28 U.S.C. § 1332(a) .................................................................... 1

KRS § 411.184(2) ..................................................................... 23

**Other Authorities**

3 Am. Jur. 2d *Agency* § 167 ............................................................ 52

**Rules**

Fed. R. Civ. P. 26(a)(1)(A)(iii) ........................................................ 36

Fed. R. Civ. P. 37(c)(1)................................................................... 36

Fed. R. Civ. P. 8(c)(1) .................................................................... 51

## STATEMENT REGARDING ORAL ARGUMENT

Defendants Joe Newton, Joseph Newton, and Players' Dugout, Inc. believe that oral argument could assist the court in resolving the numerous legal and factual issues raised by this appeal and request the opportunity to present such argument.

## JURISDICTIONAL STATEMENT

The district court had diversity jurisdiction over this case. *See* 28 U.S.C. § 1332(a). The court entered judgment on January 12, 2022, R. 164, and, on August 22, 2022, denied the timely motion for judgment notwithstanding the verdict and/or a new trial filed by Defendants, R. 184. Defendants timely appealed. R. 185. This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES ON APPEAL

1.      Whether the district court committed an error of law, and therefore abused its discretion, by allowing the jury to award Plaintiffs excessive lost-profit damages under the Lanham Act?

2.      Whether the legally erroneous punitive damages instruction, which omits the required "clear and convincing" standard, requires vacatur or remittitur of the punitive damages award?

3.      Whether the court erred by submitting the parties' breach of contract claims to the jury where Plaintiff admitted he failed to take actions required by the contract, thereby committing the first breach?

4.      Whether the court erred by refusing to instruct the jury that it could find Dr. House personally liable for defaming Defendants?

### STATEMENT OF THE CASE

For 20 years, Joe Newton ran a baseball academy in Elizabethtown, Kentucky called Players' Dugout, Inc. Before the events of this case drove Players' Dugout out of business, Joe spent his days holding youth baseball camps, renting out batting cages and training facilities to local teams, and giving private hitting and pitching lessons to local athletes ranging from little leaguers to big leaguers. Transcript ("Tr."), R. 153, PageID #1799. But thanks to false and defamatory statements by Plaintiffs Tom House and the National Pitching Association ("NPA"), those days are long gone. Yet, the trial below resulted in Joe Newton, his son Joseph, and Players' Dugout owing House and the NPA hundreds of thousands of dollars in royalties and disgorged "profits" even though Players' Dugout lost money and, ultimately, went under.

## I.   Factual Background

In the early 2000s, Joe heard about a training program for baseball coaches put on by a well-known pitching expert, Dr. Tom House, who had been Major League relief pitcher in the 1970s but is best known for his work as a pitching coach and biomechanics researcher. Tr., R. 155, PageID #2044, 2054–55. He's also the founder and majority shareholder of the NPA. *Id.* PageID #2072–73; Amended Compl., R. 39, PageID #236; License Agreement, R. 51-1, PageID #513. The NPA offers coaching clinics, usually

held at the University of Southern California, where coaches and trainers from across the country come to receive instruction from House and other experts. Tr., R. 157, PageID #2145. Those who attend these clinics receive an NPA certification and the right to hold themselves out as NPA-certified coaches. Tr., R. 153, PageID #1801, 1804.

In 2003, Joe attended an NPA clinic, where he met House. *Id.*, PageID #1800–01. Over the ensuing years, Joe became a regular at NPA events and got to know House well. He even flew House out to Kentucky to put on in-person pitching seminars in 2004 and 2005. *Id.*, PageID #1803. Joe also met many other coaches and instructors from around the country through the NPA. One of them was a pitching coach from Salisbury, Maryland, who was part-owner of the NPA: Jamie Evans. *Id.*, PageID #1802.

In the winter of 2010, Evans called Joe to tell him about a new velocity program that had achieved startling results for several of his young players. *Id.*, PageID #1805. The program was based on an arm-strengthening regimen developed by Dr. House called Personally Adaptive Joint Threshold Training—PAJTT, for short. Tr., R. 155, PageID #2069–70. Though the PAJTT program was principally designed to promote arm health and to prevent shoulder injuries, Evans found that players who went through the program were suddenly able to throw a baseball much harder. *Id.*, PageID

#2051. Fascinated by this unexpected outcome, Evans asked Joe if he would be interested in gathering a group of kids in Kentucky to see if he could replicate the same results. Joe agreed, teamed up with a local high school coach, and took the new velocity program for a spin. Tr., R. 153, PageID #1807–08.

### A.    The PAJTT Program

The program consists of two parts: a joint-integrity component and a PAJTT component. Tr., R. 157, PageID #2255.

The joint-integrity component is intended to "establish baseline strength and stabilization in the shoulder so that the pitcher will be physically ready for testing." *Id.* It involves a throwing motion with various weighted balls from three different positions (knees, rocker, and "run-and-gun"). *Id.*, PageID #2255–56. A key aspect of the program's effectiveness is that, for most of the throwing motions described above, the student does not actually release the ball. Rather, the protocol prescribes "three holds and two throws with each weighted ball from each body position at maximum intensity." *Id.*, PageID #2256. This "hold" protocol was based on Dr. House's observation that shoulder injuries are rare among tennis players, even though the serving motion in tennis is virtually identical to the throwing motion in baseball and football. He determined that the reason tennis players so rarely injure their

4

shoulders is that "they hang on to the tennis racket." Tr., R. 155, PageID
#2059. Thus, PAJTT trains athletes to hold onto weighted balls to strengthen
muscle groups on the back side of the shoulder. Tr., R. 153, PageID #1829–30;
Tr., R. 157, PageID #2265. That, in turn, increases overall shoulder strength
and reduces the likelihood of injury. *Id.*

After establishing joint integrity, the athlete progresses to the PAJTT
component. This begins with an evaluation of the athlete's "velocity
spreads"—*i.e.*, differences in velocity between differently-weighted balls. *Id.*,
PageID #2259. A personalized weighted-ball training program is then written
based on an analysis of those spreads. *Id.* Thus, for some athletes, that tailored
program would focus on increasing arm speed, while for others it would focus
on developing strength. R. 159, PageID #2441–42.

To Joe's amazement, the velocity program yielded the same eye-popping
results in Elizabethtown as it had in Salisbury. His students' pitch velocity
climbed higher and higher, yet none of them experienced injuries. Tr., R. 153,
PageID #1815.

### B.    Stevie Delabar

Around that time, in 2012, a minor-league pitcher named Stevie Delabar
returned home to Kentucky. Tr., R. 153, PageID #1815–16. Delabar had spent
the last several years playing professional ball, but he had never been able to

rise above the lowest level of the minors. One day, while playing in an independent wood-bat league in Massachusetts, Delabar threw a pitch that broke his arm. *Id.*, PageID #1818. Doctors repaired his bones with a metal plate and nine screws, *id.*, but at 27 years old with a blown arm and no prospects, Delabar was "[t]otally washed up." Tr., R. 159, PageID #2431. He returned home to Elizabethtown, took a job as a substitute teacher and assistant high school baseball coach, and joined a slow-pitch softball league. Tr., R. 153, PageID #1816.

Delabar heard about the new velocity program Players' Dugout was offering. He asked Joe if he could try the program to see if it was something that might benefit the kids he was coaching. *Id.* Delabar had never been a high-velocity pitcher; before his injury, his fastball topped out at 91 mph. *Id.*, PageID #1818. But after just a few weeks working through the velocity program, Delabar was throwing fastballs in the mid-to-high 90s—a massive jump in baseball terms—with no pain. *Id.*, PageID #1818–19.

Astonished at Delabar's progress, Joe contacted a friend who scouted for the Seattle Mariners. *Id.* The scout agreed to travel to Kentucky to see what Delabar could do. Delabar delivered a performance that was, in a word, "[p]henomenal." *Id.*, PageID #1819. His fastball velocity had attained an elite

level, ranging between 97 and 100 mph. *Id.* A few days later, Delabar had a minor-league deal. *Id.*

Delabar rocketed through the minor leagues, making it to the big leagues in his very first season. *Id.*, PageID #1819–20. The next year, Delabar made the American League all-star team, setting him apart as one of the best pitchers in the sport. Tr., R. 159, PageID #2432. HBO's *Real Sports* aired a feature chronicling Delabar's meteoric rise from substitute teacher to big-league ace. *Id.* PageID #2431; R. 153, PageID #1823–24. That featured delved deeply into the velocity program, which Delabar credited as the secret to his comeback. *Id.*, PageID #1834–35.

### C.    Velocity Plus Arm Care

Once word got out that Players' Dugout's velocity program was behind Delabar's success, demand skyrocketed. *Id.* Joe was inundated with requests for the training he had given Delabar. His business, which had always relied on multiple revenue streams, began to orient almost exclusively around "Velocity Plus Arm Care," as the program came to be called. *Id.*, PageID #1835–36. Other baseball academies interested in offering Velocity Plus to their students entered distributorship agreements authorizing them to sell the program. Those academies would conduct the initial player assessment, then Jamie Evans would write an individualized training program based on that

assessment. *Id.*, PageID #1827–29. Distributors would sell Velocity Plus for $435, keep a $100 commission, and remit the balance to Players' Dugout, which split the proceeds with Evans. *Id.* These arrangements proliferated throughout 2012, making it the highest grossing year in Players' Dugout's history (to that point). *Id.*, PageID #1838.

On January 13, 2013, Tom House sent a letter to Joe and Evans congratulating them on the success of Velocity Plus. House Letter, R. 51-5, PageID #578. In the letter, House expressed optimism that they were just beginning to "tap[]the potential market domestically and internationally," while also insisting that he was not "receiving proper consideration and/or recognition" for the program's success. *Id.* To that end, he said, "[I]t is time to legally firm up our working relationship." *Id.* He continued:

> I have applied for patent, copyright, and trademark protection on my intellectual property. There is pending legal consensus that without my body of work and research there would be no Personally Adaptive Joint Threshold Training, no Steve Delabar, and nothing with this value proposition to market. I am looking for what is right with full disclosure and fairness in an agreement. It would be great if the 3 of us could come up with a written document by February 1st. If not, let's have our attorneys hammer something out so it doesn't get adversarial.

*Id.*; Tr., R. 153, PageID #1839–40.

Joe was eager for the chance to work with House, so he and Evans agreed to meet with him as soon as possible. The meeting occurred in

February 2013 at O'Hare Airport. *Id.*, PageID #1845–46. As far as Joe and House were concerned, the meeting was a success. *Id.* In House's words, "Joe went all in with us," Tr., R. 155, PageID #2087, and even though a deal wasn't reached that day, both House and Joe felt good about the prospects for reaching an agreement soon. *Id.*; Tr., R. 153, PageID #1846. But Evans, House's long-time business partner, was a different story; they had a falling out that day over Evans' alleged refusal to pay House money he owed. Tr., R. 155, PageID #2087. House fired him from the NPA on the spot and told him, according to House's own testimony: "Jamie, go do your thing, but don't associate anything with me. You're dead to me. I wouldn't pee on you if you were on fire in an intersection." *Id.*

In the months that followed, Joe kept in touch with House. He and his son-in-law had dinner with House and his wife, Marie, at an NPA clinic that summer. Tr., R. 153, PageID #1847. During that meal, House expressed concern that people were pirating the PAJTT program without his permission and even named Evans as one of the culprits. *Id.*, PageID #1847–48. A few months later, Joe visited House again, this time accompanied by Delabar and two other professional baseball players from Kentucky. *Id.*, PageID #1852. Throughout this period, House never raised any objection to Joe's continued marketing of Velocity Plus, nor did he attempt to formalize any agreement. *Id.*

### D.    The License Agreement

That winter, Joe and his son Joseph—who was then an employee of
Players' Dugout—hired lawyers to draft an agreement granting Players'
Dugout an exclusive license to market and distribute the PAJTT program. *Id.*,
PageID #1854. They flew to California in late January 2014 and presented the
proposed contract to House and his wife, Marie. *Id.*, PageID #1854. A few
days later, after taking time to review the document with his wife, Tr., R. 161,
PageID #2625, House signed the agreement. *See* License Agreement, R. 51-1,
PageID #512.

In the Agreement, House warranted—falsely—that he had acquired a
patent for the PAJTT program. *Id.* And he purported to grant Players' Dugout
an "exclusive worldwide license to use [House's] Know-how and commercial
and technical information to use, sell, lease, rent, create participant programs,
or otherwise commercialize the PAJTT Program under the name 'Velocity
Plus Arm Care Program' throughout the world, with full right to sublicense
and distribute the program subject to any restrictions contained herein." *Id.*
The contract contained several provisions relevant to this appeal, including:

- <u>License</u>: Players' Dugout had the exclusive right to use and sell the
  PAJTT/Velocity Plus program for applications in baseball and softball.

- <u>Royalties</u>: House would receive from Players' Dugout a royalty of $50
  for each first-time participant who bought the program and $40 for each

repeat participant. Royalty payments for each calendar month were due on the tenth day of the following month.

- Piracy: House was required to prevent others from pirating the program by:
  - o Refraining from knowingly permitting third parties under his control to market PAJTT without a distributor agreement from Players' Dugout;
  - o Promptly reporting to Players' Dugout any third parties (whether or not under his control) known or suspected to be using the program without its authorization; and
  - o Serving notice on those parties that they are not authorized to use or sell the program.

- Liquidated Damages: If House "makes no meaningful effort to stop or otherwise prevent such piracy or fails to inform [Players' Dugout] of such violations [House] shall pay [Players' Dugout] a sum of five hundred thousand dollars ($500,000.00) as liquidated damages."

*Id.*, PageID #513–14.

### E.    Royalties and Pirates

With the exclusive License Agreement in hand, the already strong sales of the Velocity Plus program grew even stronger. House sent an email to all coaches in the NPA network stating that anyone who wished to use the Velocity Plus program needed to go through Players' Dugout. Tr., R. 153, PageID #1871. By now, Joe was writing individualized training protocols on his own and was travelling regularly to meet with House to ensure that he continued to adhere to the PAJTT protocols correctly and to lead NPA certification clinics focused on Velocity Plus. *Id.*, PageID #1872–74. Joe even gave a presentation with House and Delabar in front of 5,000 high school

11

baseball coaches at the annual meeting of the American Baseball Coaches Association in Orlando. *Id.*, PageID #1878–79. That year, Players' Dugout posted its highest revenue ever: $721,062. *Id.*, PageID #1877.

House made a lot of money too, as royalty checks from Players' Dugout came rolling in every month. Tr., R. 155, PageID #2114. Those payments added up quickly, amounting to over $100,000 between March 2014 and August 2015. Tr., R. 159, PageID #2418.

But even as House willingly pocketed these monthly royalty checks, he made no effort to uphold his end of the Agreement.

For one thing, despite expressly warranting in the Agreement that he held an active patent for PAJTT, and that he would pursue remedies against infringers (License Agreement, R. 51-1, PageID #517, § 11(g)), House never actually obtained a patent. Tr., R. 159, PageID #2451. Though he did submit a patent application *after* entering the Agreement, he ultimately abandoned it. *Id.*, PageID #2428–29 (House instructed his lawyers to put the patent application "on the shelf. I have no interest in getting a patent anymore").

For another thing, House made no effort to stop known attempts to pirate the program, as he was required to do. License Agreement, R. 51-1, PageID #514, § 3(c)–(d). On several occasions, Joseph notified House of attempts by others to capitalize on the success of Velocity Plus by offering

knock-off programs purporting to use the same training methods. In October 2014, Joseph forwarded to Marie House[1] a message from a Velocity Plus distributor reporting a copycat program at an academy in Florida. 11/4/2014 Email, R. 51-6. The email included marketing materials from the academy that expressly invoked the Delabar story, and the key role "holds" play in rectifying imbalances in shoulder musculature. *Id.*; Tr., R. 155, PageID #2026–27. Joseph asked House to send a cease-and-desist letter and even attached an example of what he had in mind. R. 51-6.

Joseph followed up a few days later, with another report of suspected piracy, this time by an NPA member, Gardy O'Flynn. 11/8/2014 Email, R. 51-7. Marie "informed Tom" of this report. *Id.* In response to these reports, House's patent lawyers prepared a form letter to be sent to suspected copycats. App. 29 (Plaintiff's Exhibit ("PEX") 28).[2] However, it was not a cease-and-desist letter; rather, it directed any company "interested in obtaining a license to Mr. House's methods" to contact House through his attorneys. *Id.* The letter did not mention Players' Dugout, which held the "exclusive worldwide license" to use and sell PAJTT. License Agreement, R. 51-1, PageID #512.

---

[1] All parties acknowledged at trial that Marie, who works for the NPA, was a key point of contact between Players' Dugout and Tom House.

[2] The Appendix ("App.") to this brief includes trial exhibits offered by the parties that do not appear on ECF. *See* Exhibit Inventory, R. 168 ("Exhibits are stored in Exhibit Room/Vault").

And in any event, Marie conceded that "Tom House never sent that . . . letter to anyone." Tr., R. 161, PageID #2639.

According to Marie, Joseph identified many "copycats" over the life of the Agreement. *Id.*, PageID #2632. This included a list of seven suspected offenders that Joseph sent to Marie in June 2015, along with links to online sites where those people marketed their own versions of the velocity program. *See* 6/2/2015 Email, R. 51-8, PageID #581; Tr., R. 161, PageID #2660. But even though Tom House was aware of these reports, he admitted that he never made any effort to stop them. Tr., R. 159, PageID # 2487–88. When asked at trial whether he ever reached out to suspected copycats, House said they "weren't worth a call." *Id.*, PageID #2493.

Among those suspected of using PAJTT/Velocity Plus without authorization was Jamie Evans. Since leaving the NPA, Evans had continued writing PAJTT programs for athletes under the auspices of a company called VeloCity. Tr., R. 161, PageID #2650. Joseph notified House on multiple occasions that Evans was still writing programs using House's research. *Id.*; 6/2/2015 Email, R. 51-8, PageID #581. House even received independent reports that Evans was ignoring proper protocols and injuring kids. Maryland Injuries Email, R. 71-9; Tr., R. 155, PageID #2096. But when asked at trial whether he did anything to stop Evans from pirating the program, House

14

responded, "Why should I? I told him, 'Do what you want to do.'" Tr., R.
159, PageID #2458.

### F.    Baseball Express

In early 2015, House hired two people to help improve the NPA's
business model: Gary Adornato and Alex Marney.

Marney's family owned a company called Baseball Express. *Id.*, PageID
#2398. At the time, Baseball Express was a premier online retailer of baseball
products, "like a Dick's Sporting Goods online times ten. It was huge." *Id.*,
PageID #2379. House hired Marney to help market House's products through
the Baseball Express platform. *Id.*, PageID #2379, 2398.

Gary Adornato was a "business consultant," whom House brought in to
help him "get better, more efficient." Tr., R. 159, PageID #2397. House tasked
Adornato with reviewing each of his outstanding contracts, including the
agreement with Players' Dugout. *Id.*, PageID #2414. Adornato concluded that
the License Agreement was "a really one-sided" deal that was "not good" for
House. *Id.*, PageID #2402.

In April 2015, House brought Marney to Elizabethtown to meet with the
Newtons. Tr., R. 153, PageID #1884. The purpose of that meeting was to "try
and convince [the Newtons] that [they] needed to sell the [Velocity Plus]
program through Baseball Express," Tr., R. 161, PageID #2673, including the

weighted balls that Players' Dugout sold along with the program, Tr., R. 153, PageID #1885. The Newtons declined because such a move "would have destroyed" Players' Dugout's business. *Id.*, PageID #1885. House then became "[v]ery upset. F-bombs were dropped." *Id.* He began "[b]eating the table, screaming." Tr., R. 161, PageID #2673. Unable to persuade the Newtons to alter the terms of the Agreement, House and Marney left Kentucky. Joe didn't hear from them again for many months. R. 153, PageID #1889. Meanwhile, Adornato and Marney advised House to hire an attorney in Kentucky "to see what could be done about the contract." Tr., R. 159, PageID #2421.

G.   **Defamatory Statements about Players' Dugout**

On October 10, 2015, just a few months after the heated meeting at Players' Dugout, House attended a clinic in Miami, Florida. Schopp Depo., R. 169-1, PageID #3153.[3] One of the people present at that clinic was Bill Schopp, an NPA-certified coach who was an authorized distributor of Velocity Plus and knew the Newtons and Players' Dugout well. *Id.*, PageID #3149–52. House told Schopp that the Newton's Velocity Plus program was "hurting a lot of arms." *Id.*, PageID #3153. Taken aback, Schopp replied, "Coach Tom, I've used it on hundreds of kids and I've never had an injury." *Id.*

---

[3] Excerpts from the deposition of Bill Schopp, R. 169-1, were admitted as part of the trial record. *See* R. 183, PageID #3633.

Three days later, Adornato—then-CEO of the NPA—sent a letter to Players' Dugout repeating House's false accusations. It states, "I have become aware of a disturbing number of young athletes who claim to have been injured by the particular program that you are promoting. Unfortunately, these letters have not come from you, but directly from the aggrieved parties." Adornato Ltr., R. 5-1, PageID #72–73. As a result, Adornato demanded that Players' Dugout remove all references to Tom House or the NPA from its "marketing materials, product packaging, websites, etc." and cease any suggestion that Velocity Plus is endorsed by House or the NPA. *Id.*, PageID #73. House was copied on the letter and discussed its contents with Adornato before it was sent. Tr., R. 159, PageID #2369–71; App. 138 (Defendants' Exhibit ("DEX") 125). Notably, the October 13 letter did not purport to terminate the License Agreement giving Defendants the exclusive right to market the PAJTT program. *See* Adornato Ltr., R. 5-1, PageID #72–73.

Less than two weeks later, Marney sent an email to all NPA-certified coaches making the same false accusation against the Newtons and Players' Dugout. Though not sent from his account, the email is signed with Tom House's name. NPA Email, R. 51-10, PageID #597–98. After describing some ways that the NPA's "business is being redefined," House introduces Adornato and says, "I've asked him to say a few words and provide an update,

which you'll find just below." *Id.*, PageID #598. In the "update" that follows,

Adornato includes this paragraph:

> In keeping that promise, an announcement: effective immediately, NPA has ended its affiliation with, and endorsement of, Joe Newton and his company, Velocity Plus. As some of you know, Joe has been representing our work through his programs for a while now. Some time ago, we learned that he was not using all of the protocols that make the program safe and effective, and told him so repeatedly. He has refused to change and comply with the full program, and as such markets a form of our work that we cannot endorse or defend; indeed, as a possible result of his changes and omissions, we have learned that several of his customers have been hurt, and the reputation of our program has been impacted.

*Id.*

The problem with these claims—first by House, then by Adornato on his

behalf—is that they are undisputedly false. When asked at trial about the

assertion that several of Players' Dugout's customers "have been hurt," House

testified, "[t]here is absolutely no basis for that statement." Tr., R. 159, PageID

#2385. When asked whether he had any "letters" from aggrieved parties,

House testified, "I do not." *Id.*, PageID #2360. And when asked whether he

had ever attempted to retract the false statements published to the entire NPA

network, including numerous Players' Dugout customers, on his behalf, House

replied, "No. . . . Why should I have?" *Id.*, PageID #2385.

18

### H.    Missed Royalty Checks

The weeks that preceded the fateful letter from Adornato were a busy time for Joseph Newton. He was in the throes of building a new home for his young family, and in late August, his wife had just had a new baby. Tr., R. 161, PageID #2593–94. Joseph was the only person at Players' Dugout who knew how to calculate royalty payments and send them to House. *Id.* But with so much going on in his personal life, when the September 10 deadline came, he forgot to send a check. *Id.* When Marie checked in with him a few days later, Joseph explained what was going on and assured her that he would send payment soon. *Id.*, PageID #2594. In her own words, "I didn't think anything of it." *Id.*

Indeed, on the Saturday that Adornato's letter arrived, the elder Joe was in the office trying to get caught up on the checks that hadn't gone out over the previous month. Tr., R. 153, PageID #1890–91. When Joe saw the letter purporting to dissociate House and the NPA from Velocity Plus based on spurious allegations that it was injuring players, he was stunned. *Id.*, PageID #1895–97. Not knowing what to do, he held the royalty checks due under the Agreement and placed them in a bank account bearing House's name. *Id.*, PageID #1898. Though he attempted to reach House by phone, House never called him back. *Id.*, PageID #1897. So each month thereafter, as royalty

checks came due, Players' Dugout deposited them into the designated account. *Id.*, PageID #1734–35. This was done at the advice of counsel. Tr., R. 155, Page ID #1997.

## I.   Players' Dugout Goes Under

On October 28, the Newtons learned of the defamatory email sent to all NPA-certified coaches on House's behalf. Joe read it and was crushed. Tr., R. 153, PageID #1903. Not only were these public accusations of injuries and unsafe protocols completely untrue, but they also could not have come at worse time: October is the beginning of the baseball offseason, when training academies like Players' Dugout earn the vast majority of their income. *Id.*, PageID #1902–03.

These accusations of unsafe training practices, stamped with the imprimatur of a heavy hitter like House, caused Players' Dugout's business to tank. Over the next year, its revenue declined by roughly half. *Id.*, PageID #1904. The company was forced to lay off Joe's son-in-law because it couldn't afford to pay him. *Id.*, PageID #1903. By 2017, its revenue was only $217,226—the lowest ever since Velocity Plus began in 2012. *Id.*, PageID #1906. By 2018, it earned even less: $62,950. *Id.* And in 2019, it earned nothing; the company that had supported Joe for more than 20 years ceased to exist. *Id.*

## II.    Procedural Background

On June 29, 2016, House's lawyers sent a letter to Players' Dugout purporting to terminate the License Agreement for nonpayment of royalties. Termination Letter, R. 37-4. Three months later, House and the NPA filed this lawsuit.

House asserted a claim for breach of the License Agreement as well as state and federal trademark and unfair competition claims. The contract claim sought to recover all royalty payments withheld since September 2015. The trademark and unfair competition claims sought damages under state law and the Lanham Act for Players' Dugout's use of House's name in its marketing materials—specifically, the phrase "Powered by Tom House," which appeared on its website—between June 29, 2016 (when House terminated the Agreement) and September 7, 2017 (when the parties jointly stipulated that the alleged infringement had ceased). The NPA likewise sought to recover under state and federal law for the use of its logo on Players' Dugout's website between October 13, 2015, when Adornato sent a letter demanding that Players' Dugout cease using the mark, and September 7, 2017.

Players' Dugout and the Newtons filed counterclaims for, among other things, breach of the License Agreement, defamation *per se* and *per quod*, unfair competition, and tortious interference with prospective business advantage.

After an eight-day trial, the jury returned a verdict in House's and the NPA's favor as to their contract, trademark, and unfair competition claims. It found in the Newtons' and Players' Dugout's favor as to their defamation *per quod*, unfair-competition, and tortious-interference claims. Notably, the court refused Defendants' request for jury instructions applying the defamation claims against House personally. The jury awarded House and the NPA $448,039.02, offset by an award of $200,000 to Players' Dugout and the Newtons.

After the district court denied Defendants' motion for a judgment notwithstanding the verdict or for a new trial, Defendants timely appealed. Plaintiffs did not cross-appeal.

## SUMMARY OF THE ARGUMENT

The district court committed reversible error in four ways.

*First*, the court failed to meet its obligation, as a court sitting in equity, to prevent the jury from awarding excessive damages on Plaintiffs' federal trademark and unfair competition claims. The Lanham Act permits the owner of an infringed trademark to recover a defendant's *profits* if they are *attributable* to proven infringement. But here, the jury awarded Plaintiffs all Velocity Plus *sales*—not profits—without any proof that all those sales were attributable to Players' Dugout's website. Because the recovery of profits is an equitable

remedy, the Lanham Act gives trial courts discretion to adjust jury awards that are "excessive" and specifies that any such award must be "compensation and not a penalty." 15 U.S.C. § 1117(a). Here the court committed an error of law—and therefore abused its discretion—by failing to reduce the excessive damages award when the record was clear that Players' Dugout's profits were nowhere near the $340,000 jury awarded on that claim; indeed, Players' Dugout lost money, and eventually went out of business, over the period of alleged infringement.

*Second*, the court also erred when instructing the jury on Plaintiffs' claims for punitive damages on their state-law claims. Under Kentucky law, punitive damages are only available if the plaintiff proves by "clear and convincing evidence" that the defendant acted with malice and oppression. KRS 411.184(2). But here, the court instructed the jury it could award punitive damages based on a mere preponderance of evidence. That kind of clear error is presumptively prejudicial.

*Third*, the district court improperly allowed the question of whether House breached the License Agreement to be presented to the jury. House testified that he never performed his duties under the Agreement and that his own failure to perform preceded Players' Dugout's missed royalty payments. Given those admissions, no reasonable juror should have been able to find for

23

House on the breach of contract claims. Yet, the court denied Players' Dugout's motion for judgment as a matter of law on this issue.

*Finally*, the district court refused to allow the jury to consider whether Dr. House should be personally liable for defaming Players' Dugout and the Newtons. Defendants requested two jury instructions that would have accomplished this: (1) an instruction that asked the jury to consider whether House ratified the defamatory statements made by the NPA in the October 26 email to all NPA-certified coaches, and (2) an instruction for a defamation *per se* claim against House for his own statements to Bill Schopp. The court denied both requests, erroneously. It incorrectly believed the first request was not legally permissible. It found the second request improper because Defendants failed to point to concrete harm from those remarks; but on a defamation *per se* claim, an injured party doesn't *need* to prove harm as a matter of law.

## ARGUMENT

## I.    The Damages Award for Trademark Infringement and Unfair Competition Must Be Reversed.

### A.    Plaintiffs Failed to Satisfy their Burden of Showing Lost Profits Attributable to the Alleged Infringement and Unfair Competition.[4]

Under the Lanham Act, "[a] plaintiff may be entitled to *a portion of* a defendant's profits where the evidence shows that some portion of those profits were *attributable to the use of the plaintiff's mark*." *Cernelle v. Graminex, LLC*, 2022 WL 2759867, at *5 (6th Cir. July 14, 2022) (emphasis added). The plaintiff bears the burden to show that there is "a reasonable relationship" between the profits sought and the infringing activity. *Max Rack, Inc. v. Core Health & Fitness, LLC*, 40 F.4th 454, 472 (6th Cir. 2022), *reh'g denied*, 2022 WL 3237492 (6th Cir. Aug. 10, 2022). "If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case." 15 U.S.C. § 1117(a). "Such sum . . . shall constitute compensation and not a penalty." *Id.*

---

[4] Defendants moved the district court for a new trial because the jury reached a "seriously erroneous result" in its award of profits under the Lanham Act. *Brooks v. Toyotomi Co.*, 86 F.3d 582 (6th Cir.1996). The court denied the motion, and this Court reviews that denial for an abuse of discretion. *Workman v. Frito-Lay, Inc.*, 165 F.3d 460, 467 n.7 (6th Cir. 1999).

Despite this clear legal standard, Plaintiffs made no attempt to tie the profits they sought to the alleged infringement. The only evidence of trademark infringement presented at trial involved Players' Dugout's website. Specifically, Plaintiffs introduced an unauthenticated marketing photograph, purportedly from the Players' Dugout website, showing that the NPA's logo on one of the five baseballs held by Stevie Delabar:



App. 31 (PEX 47). Similarly, on their unfair competition claims, Plaintiffs complained that for a period of time after House terminated the License Agreement in June 2016, the website still indicated that the Velocity Plus Program was "Powered by Tom House." Tr., R. 153, PageID #1719. No other acts of infringement, besides these fleeting references on the website, were alleged or proven.

But, when it came time to prove the amount of sales attributable to that website-based infringement, Plaintiffs whiffed. The only testimony on infringing sales came from Marie House, Tom's wife. It was sparse, to put it charitably:

> Q. Okay. And from those royalty reports, were you able to make a calculation of the gross revenues that PDI – for that period of time that Players' Dugout generated from selling the individualized PAJTT programs?
>
> A. Yes.
>
> Q. Okay. And what was that – what is that number that you --
>
> MR. PAUL: Object for the record, but we understand.
>
> Q. What was that number that you calculated as the gross revenues?
>
> A. It was 337,190 or something like that. Something in that area. 195, maybe.

Tr., R. 161, PageID #2612. In other words, Marie House simply pointed to royalty reports showing the total sales for the PAJTT Program from November 2015 (the first full month after NPA instructed Defendants to stop using its trademark) until July 2017 (the last month for which royalty reports were available).

Similarly, when trying to quantify the damages that Plaintiffs sought for the use of House's name, Plaintiffs simply pointed to royalty reports showing the total sales of the PAJTT Program during that relevant period:

27

Q. Okay. So then for the period from July 1st, 2016, which is the next full month after the notice was given until July 5, 2017, which is the end date here in Exhibit 58 that you see, did you make a calculation of Players' Dugout's total revenues from selling the program during that period?

A. I did.

Q. Okay. And what were those total revenues?

A. My recollection is $141,700 something, I think.

*Id.*, PageID # 2619.

Plaintiffs didn't even attempt to estimate how many of those sales came from the website as opposed to other income streams—such as referrals from NPA coaches, which don't come through the website. Nor did she make any effort to show what portion of those sales translated into profit (as discussed below). She simply read a top-line number off a revenue report.

These omissions are glaring because Players' Dugout was not an e-commerce business. Rather, it survived largely on referrals from coaches and word-of-mouth marketing through in-person presentations, like the one Joe gave in 2014 to thousands of coaches in Orlando (and countless others like it). Tr., R. 153, PageID #1878–82; Schopp Depo, R. 169-1, PageID #3150 (Schopp found out about Velocity Plus through an in-person clinic taught by Joe). That's why its business cratered after Plaintiffs sent out their defamatory email to all NPA coaches falsely accusing the Newtons of injuring athletes; if

the website alone were enough to sustain sales, the company wouldn't have suffered such a devastating decline in income over the period of alleged infringement.

In a similar circumstance, this Court did not hesitate to reject an award of profits altogether. In *Frisch's Restaurants v. Elby's Big Boy*, the plaintiff established that its competitor had infringed on its trademark by using the name "Big Boy" for restaurants in a market where it was not entitled to do so. 849 F.2d 1012 (6th Cir. 1988). This Court held that the plaintiff had nonetheless failed to prove damages attributable to the infringement because it made no effort to quantify which of the defendant's sales were caused by the infringing conduct as opposed to other reasons. *See id.* at 1016 ("Frisch's surveys and experts did not establish a link between patronage of the Ohio restaurants and the association of the restaurants with the Big Boy mark. Equity would thus not be served by an award to Frisch's of a percentage of the Ohio restaurants' profits.").

Likewise, district courts within this Circuit have refused to award lost profit damages where the plaintiff did not show that the infringement itself caused any ill-gotten gains. *See, e.g.*, *Timber Products Inspection, Inc. v. Coastal Container Corp.*, 827 F. Supp. 2d 819, 831 (W.D. Mich. 2011) ("Moreover, while the Court recognizes that it is quite likely that Defendant earned some

measure of profit from its activities involving the improperly marked corrugated boxes, Plaintiff has failed to establish the amount of any such profits or the extent to which such are attributable to Defendant's infringing conduct."); *Rainey v. Wayne State University*, 26 F. Supp. 2d 963, 972 (E.D. Mich. 1998) (holding, in the analogous copyright context, that "in cases where profits cannot be traced only to the infringing work but rather to a complex income stream, courts have required that plaintiff introduce detailed evidence linking gross revenues to the infringement. In this case, plaintiff has failed to submit any credible evidence from which the fact finder could apportion profits attributable to the infringement.").

Plaintiffs will no doubt argue that § 1117(a) relieves them of the burden of identifying profits related to the alleged infringement, because it states that "[i]n assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed." 15 U.S.C. § 1117(a). But, as this Court recently explained, that statutory language only begs the key question: "Which sales?" *Max Rack*, 40 F.4th at 472. A plaintiff cannot simply "place an infringer's 'corporate income tax return in the record and rest [its] case for an award of infringer's profits.'" *Id.* (quoting *Taylor v. Meirick*, 712 F.2d 1112, 1122 (7th Cir. 1983) (Posner, J.)). Rather, it must make at least a threshold showing that the sales figures it points to have

some causal nexus to the alleged infringement. *See, e.g.*, *Aecom Energy & Constr. v. Morrison Knudsen Corp.*, 851 F. App'x 20, 21 (9th Cir. 2021) ("[I]t is the plaintiff's burden to show with reasonable certainty the defendant's gross sales from the infringing activity" (cleaned up)); *On Davis v. Gap, Inc.*, 246 F.3d 152, 160–61 (2d Cir. 2001) ("[T]he district court was correct in ruling that Davis failed to discharge his burden by submitting The Gap, Inc.'s gross revenue of $1.668 billion — revenue derived in part from sales under other labels within the Gap, Inc.'s corporate family that were in no way promoted by the advertisement, not to mention sales under the 'Gap' label [for other products]."). Simply put, "a plaintiff in an infringement action must establish a 'link' between the infringement and the gross revenue figure presented." *D'Pergo Custom Guitars, Inc. v. Sweetwater Sound, Inc.*, 516 F. Supp. 3d 121, 127 (D.N.H. 2021) (citation omitted).

Here, Plaintiffs merely pointed to the total sales figure for the Velocity Plus program. That was insufficient as a matter of law to prove the relevant sales because Plaintiffs never tried to "link" the sales to the fleeting acts of infringement they alleged. That all-sales-are-tainted assumption came nowhere close to meeting their burden of showing a causal nexus under § 1117(a).

**B.    The Trial Court Erred in Failing to Reduce Damages Award Under § 1117(a) to Ensure It Was Not Excessive.**

The Lanham Act's remedies are equitable. *See Max Rack*, 40 F.4th at 471. That includes requests for disgorgement of a defendant's allegedly ill-gotten profits. *Id.* Consistent with those equitable principles, the statute arms the trial court with discretion—indeed, duty—to adjust a damages award under the Lanham Act if it is too high. *See* 15 U.S.C. § 1117(a). The statute commands courts to set damages in an amount that "shall constitute compensation *and not a penalty*." *Id.* (emphasis added). The "grant of this 'unusual power and responsibility' to the district court 'both implements the broad equitable discretion generally accorded to courts in trademark matters and recognizes the occasional danger that verdicts based on [technical trademark] formulations will do serious injustice.'" *CollegeNET, Inc. v. XAP Corp.*, 483 F. Supp. 2d 1058, 1064 (D. Or. 2007) (citation omitted)). The court's failure to exercise that power is reviewed for an abuse of discretion. *La Quinta Corp. v. Heartland Properties LLC*, 603 F.3d 327, 342 (6th Cir. 2010).

Here, the court committed an error of law, and therefore abused its discretion, *see United States v. Lawrence*, 555 F.3d 254, 261 (6th Cir. 2009), by failing to reduce an excessive trademark damages award. It expressly permitted the jury to award Plaintiffs all of Defendants' gross *revenue*, even though the Lanham Act only allows a party to recover net *profits*. *See* 15 U.S.C. § 1117(a)

(allowing plaintiff, "subject to the principles of equity, to recover (1) defendant's profits . . ."); *see also, e.g.*, *Sands, Taylor Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 963 (7th Cir. 1992) (reversing an award of damages that was "a windfall to the plaintiff" and "bears no relationship to that enrichment").

In allowing Plaintiffs to recover 100% of Defendants' gross sales, the court abdicated its role, sitting in equity, to "fashion any remedy deemed necessary and appropriate to do justice in a particular case." *Carter-Jones Lumber Co. v. Dixie Distributing*, 166 F.3d 840, 846 (6th Cir. 1999)). The court was not sufficiently "mindful of the fact that awards of profits are to be limited by 'equitable considerations.'" *Sands*, 978 F.2d at 961.

What the trial court should have done, instead, was follow the lead of the U.S. District Court for the District of Columbia in *Breaking the Chain Found., Inc. v. Capitol Educ. Support, Inc.*, 625 F. Supp. 2d 1 (D.D.C. 2009). There, as here, a plaintiff who prevailed in a trademark infringement case sought to recover all the defendant's revenues from staging a concert that infringed on its trademark. The court refused, however: "Although the statute also provides that a plaintiff need prove defendant's sales only, and it is defendant's burden to prove all elements of cost or deductions claimed, *see id.*, that does not mean that the Court may ignore evidence in the record before it as to defendant's cost and deductions*." Id.* at 3 (D.D.C. 2009) (emphasis added).

33

Rather, the court held, when the record contains evidence of a defendant's costs, a court "is obligated to consider such evidence and award Plaintiff only Defendant's profits, as statutorily provided for under section 35 of the Lanham Act." *Id.; see also S.C. Johnson & Son, Inc. v. Nutraceutical Corp.*, 2019 WL 1320313, at *9, *11 (E.D. Wis. Mar. 22, 2019) (rejecting plaintiff's request for 100% of the gross sales because it would constitute a "windfall," even though defendant "failed to produce any evidence of apportionment, costs or other deductions at trial.").

Here, the record amply demonstrates that awarding $340,000 for trademark infringement and unfair competition was a windfall to Plaintiffs. Defendants offered expert evidence showing that their average annual profits from 2012 to 2016 were only 8.4% of overall sales revenue. Tr., R. 161, PageID #2689–90. What's more, Players' Dugout's corporate income tax statements, which were also admitted at trial, show that for the years when the infringement occurred, the company's overall profits were far less than the $340,000 awarded. For instance, in 2015 the company's net profit was $48,245. App. 40 (DEX 17D). The alleged infringement didn't begin until mid-October of that year. In 2016, the company's all-source net profit was $23,757. App. 61 (DEX 17E). And in 2017, the last year the alleged infringement occurred, the company operated at a net *loss* of $32,307. App. 97 (DEX 17F). In other

words, during the period when it was supposedly "profiting" from the infringement, Players' Dugout lost money.

Second, the "lost profits" the court awarded to House greatly exceeded the value of royalties he earned under the parties' contract even when the program was doing well. That is relevant because this Court has recognized that "[i]n cases of trademark infringement, however, an award of royalties 'normally received for the use of a mark' is often a 'proper measure' of damages." *Taylor v. Thomas*, 624 F. App'x 322, 328 (6th Cir. 2015).

Finally, it is inequitable—to say the least—to allow plaintiffs to recover more than 3x in lost profits than Defendants recovered on their counterclaim for defamation that destroyed their business. How can defendants owe so much more in lost profits than the jury determined the business was ultimately worth?

### C.   The Inflated Trademark Damages Award Resulted from Improper Surprise Testimony.

The Civil Rules are clear: a plaintiff must disclose both the amount of damages they are seeking and their method for calculating those damages. Indeed, even before being served with a request, a plaintiff must provide "a computation of each category of damages claimed." Fed. R. Civ. P. 26(a)(1)(A)(iii). This duty is not satisfied by "disclosure only of enough evidence to put [a defendant] on notice of the lost-profits claim." *Bessemer Lake*

*Erie v. Seaway Marine Trans*, 596 F.3d 357, 369 (6th Cir. 2010); *see also Scheel v. Harris*, 2012 WL 3879279, at *4 (E.D. Ky. Sept. 6, 2012). Rather, "a party must provide a *computation* of its damages." *Advanced Training Grp. Worldwide v. Proactive Techs.*, 2020 WL 4574493, at *4 (E.D. Va. Aug. 7, 2020). Moreover, "Rule 26(e)(1) establishes a duty to supplement disclosures made under Rule 26(a)(1)." *Toth v. Grand Trunk Railroad*, 306 F.3d 335, 343 (6th Cir. 2002).

The Federal Rules prescribe severe sanctions for failure to comply with these disclosure rules. "If a party fails to provide information . . . as required by Rule 26(a) . . . the party is not allowed to use that information . . . at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). This Rule "'requires absolute compliance with Rule 26(a), that is, it mandates that a trial court punish a party for discovery violations in connection with Rule 26 unless the violation was harmless or is substantially justified.'" *Big Lots Stores, Inc. v. Luv n' Care, Ltd.*, 302 F. App'x 423, 430 (6th Cir. 2008) (citation omitted). This Court reviews the district court's application of that mandatory exclusion rule for abuse of discretion. *Loggins v. Franklin Cty., Ohio*, 218 F. App'x 466, 478 (6th Cir. 2007).

Here, the trial court articulated the correct standard under Rules 26 and 37, and even noted that "[t]he burden is on the potentially sanctioned party to prove harmlessness." Mem. Op., R. 184, PageID #3639. Nevertheless, it

allowed Plaintiffs to pursue an amount of trademark and unfair competition damages that they never even *tried* to quantify until late in the trial.

In their initial disclosures, Plaintiffs admitted that they had not yet calculated their claimed damages. Disclosures, R. 170-2, PageID #3226. Likewise, in response to interrogatories, Plaintiffs declined to categorize or quantify their trademark damages but promised to "seasonably supplement their Answer to this Interrogatory." Responses, R. 170-3, PageID #3232.

Defendants never made good on that promise, however. Indeed, the first time that Plaintiffs ever tried to introduce a number related to the allegedly infringing sales was during Marie House's testimony (quoted in relevant part above). But even then, Plaintiffs only identified Players' Dugout's *total* PAJTT sales; they did not attempt to pinpoint sales attributable to the website, or to compute profits from those sales. That skeletal number—disclosed for the first time in an email the night before Marie House testified—would have been insufficient even if disclosed at the outset of the case. *See, e.g.*, *Bessemer*, 596 F.3d at 369.

And even after that brief testimony about total sales figures, Defendants *still* did not know that Plaintiffs were seeking 100% of Velocity Plus sales as a measure of lost profits. That revelation came at the very end of Plaintiffs'

closing argument. *See* Tr., R. 166, PageID#: 3111.[5] Defendants immediately, though unsuccessfully, objected to that surprise argument. *Id.* And because Defendants had already completed their closing argument, it was too late for counsel to argue against this theory and urge the jury to consider the other evidence showing that Players' Dugout did not profit anywhere near the $478,910 Plaintiffs sought.

In its ruling on Defendants' post-trial motions, the court found that this bottom-of-the-ninth-inning disclosure was harmless because "[l]ost profits damages, in this context . . . were Defendants' revenues, as calculated from their royalty reports, from their infringing use of Plaintiffs' trademarked program—information only Defendants could have possessed." Mem. Op., Doc. 184, PageID#: 3640. But this reasoning glosses over two fatal flaws in Plaintiffs' damages case.

First, profits *do not* equal revenues—in this context or any other. Rather, "[d]amages for lost profits must be based on the loss of net profits rather than gross profits." *DXS, Inc. v. Siemens Medical Systems., Inc.*, 100 F.3d 462, 473 (6th Cir. 1996). Thus, Plaintiffs' failure to provide a profit calculation in advance made it difficult—if not impossible—to cross-examine Marie House about how

---

[5] The numerous attempts Defendants made to elicit Plaintiff's lost-profit calculations are spelled out in their post-trial motion, R. 170-1, PageID #3200-3207.

her *sales* calculations related to Plaintiffs' still-undisclosed *profit* claim. *See Advanced Training Grp.,* 2020 WL 4574493, at *7 ("[A]ny revised damages calculation would clearly surprise ProActive at this stage of the litigation because ProActive has specifically requested this specific calculation throughout this litigation to no avail."). Second, the Lanham Act only allows a plaintiff to recover profits *attributable* to the alleged infringement. Because Defendants were unaware until the closing argument that Plaintiffs intended to characterize 100% of Players' Dugout's PAJTT sales as being attributable to the allegedly infringing website, they were not able to muster expert or other evidence undermining that overbroad assertion. *See, e.g.*, *Bessemer*, 596 F.3d at 370 ("Because Bessemer never turned over supporting documentation for its lost-profits calculation, Seaway's expert could not independently analyze Bessemer's claim."); *Myklatun v. Halliburton Energy Servs., Inc.*, 2011 WL 4916577, at *3 (W.D. Okla. Oct. 17, 2011) ("[I]t would be prejudicial to the defendants to require them to defend against a lost profits calculation that has not been disclosed in any way—or at any time—that would permit the testing and marshaling of defenses, both at the pretrial stage and for trial purposes, that would inevitably accompany a claim for lost profits. . ..").

The trial court also erred by suggesting that any prejudice to Defendants was their own fault because they allegedly failed to produce the documents

Plaintiffs needed to calculate profits. *See* Mem. Op., R. 184, PageID #3644.

That flips the statutory burden under Rule 26(a) and excuses Plaintiffs' still-unexplained failure to try to compel production of documents supposedly essential to satisfying their basic disclosure obligations. What's more, Defendants *did* disclose the royalty reports Plaintiffs used for their revenue calculation well in advance of trial. Plaintiffs requested the reports on July 27, 2021. *See* Letter, R. 179-1. And by August 31, 2021, Defendants had produced them. *See* Plaintiffs' List of Trial Exhibits, R. 109, Page ID #1181 (listing "Documents produced as requested by Plaintiffs in supplementation letter dated July 27, 2021" as Exhibit 77). And yet, Plaintiffs waited until the sixth day of trial before finally disclosing—in real time—how it intended to use those documents.

The court should have excluded the surprise damages testimony as Rule 37 requires. *See, e.g.*, *Scheel*, 2012 WL 3879279, at *4 (excluding damages evidence where "[t]he initial disclosure provided by the plaintiffs was deficient because it was completely devoid of any dollar amounts or supporting information and/or documentation"); *Advanced Training Group*, 2020 WL 4574493, at *8 ("Because ATG did not disclose a proper damages computation as required pursuant to Rule 26(a) . . . ATG will be precluded from introducing evidence related to any claimed damages at trial."); *Gould Paper Corp. v.*

40

*Madisen Corp.*, 614 F. Supp. 2d 485, 490 (S.D.N.Y. 2009) (precluding evidence of damages where defendant "did not provide a damages calculation or disclose an expert witness during discovery, as required").

The court compounded this unfair surprise by strictly enforcing the rule against Plaintiffs. Defendants' expert sought at trial to adjust the profit projections in his report, originally filed three years earlier, to account for the fact that Players' Dugout had gone completely out of business. Even though Defendants were the only party that had timely disclosed a damages expert, the court excluded their updated profits evidence, Tr., R. 161, PageID #2714–15, while allowing Plaintiffs to save their damages calculation until closing argument. That inconsistent enforcement of Rule 37 must be reversed.

## II. The Punitive Damages and Fee Awards for Plaintiffs' State-Law Trademark and Unfair-Competition Claims Are Tainted by a Fatally Flawed Punitive Damages Jury Instruction.

### A. The Punitive Damages Instruction Omitted the Required "Clear and Convincing" Evidence Standard.

Kentucky law is clear: "KRS 411.184(2) permits punitive damages to be awarded 'only upon proving, by clear and convincing evidence, that the defendant from whom such damages are sought acted toward the plaintiff with oppression, fraud or malice.'" *Eifler v. Greenamyer*, 2019 WL 2712618, at \*8 (Ky. Ct. App. June 28, 2019), *review denied* (Sept. 16, 2020). These kinds of "[e]levated evidentiary standards in civil cases must be included in jury

41

instructions." *Id.* (citing *Hardin v. Savageau*, 906 S.W.2d 356, 358 (Ky. 1995)). A punitive jury instruction that lacks the "clear and convincing evidence" standard is "fatally flawed." *Id.*; *see also Harrod Concrete and Stone Co. v. Melton*, 2007 WL 3121282, at *4 (Ky. App. Oct. 26, 2007).[6]

Here, the district court's punitive damages jury instruction against *Defendants* lacked the required "clear and convincing" language. The instruction simply read: "If you find *from a preponderance of the evidence* that Players' Dugout's or the Newtons' unfair competition was maliciously, wantonly, or oppressively done, then you may in your discretion award punitive damages against Players' Dugout or the Newtons in addition to actual damages and lost profits already awarded . . . ." Verdict, R. 143, PageID #1559 (emphasis added). That misstates the law, and the district court should have recognized as much since its punitive damages instruction against *Plaintiffs* included the "clear-and-convincing" standard. *Id.*, PageID #1572.

This faulty jury instruction fatally tainted the punitive damages verdict against Defendants. "If the elevated evidentiary standard is to have meaning and effect, the jury must be informed of the standard and directed to apply it to

---

[6] "[T]he standard of review for jury instructions is whether they, 'as a whole,' adequately informed the jury of the relevant considerations and provided enough of a legal basis for the jury to make its decision. *Bentley v. Clisso*, 89 F.3d 832, 1996 WL 306525, *3 (6th Cir. 1996).

the evidence." *Hardin*, 906 S.W.2d at 358. "Without instructing on the heightened standard, only the judge will have given it any consideration and the jury will make its determination using an erroneous standard, less than the law requires." *Id.* That is precisely what happened here.

Defendants acknowledge that no contemporaneous objection was made to the absence of the "clear and convincing" evidence standard from this jury instruction at trial. However, that does not require this Court to disregard the argument on appeal. "[I]t is a rule of longstanding and frequent repetition that erroneous instructions to the jury are presumed to be prejudicial." *Osborne v. Keeney*, 399 S.W.3d 1, 13 (Ky. 2012). Moreover, omitting the "clear and convincing" language is plain error, *Eifler*, 2019 WL 2712618, at *8, which is all that is required to remand the case for a new trial, *Fryman v. Federal Crop Ins. Corp.*, 936 F.2d 244, 248 (6th Cir. 1991). Additionally, this issue was adequately joined in the trial court, where the parties proposed a joint punitive damages instruction that included the "clear and convincing" language. *See* Proposed Instructions, R. 116, PageID #1303. And, most importantly, the court did use the correct legal standard for the instruction against Plaintiffs— just not the one for Defendants.

**B.    The Punitive Damages Award is Constitutionally Excessive.**

The flawed jury instruction undermines the punitive damages (and fee[7])

award for another reason, too: it renders it constitutionally excessive. "[E]ven

where the jury has found an entitlement to punitive damages, the appropriate

punitive damages award may still be zero." *Kidis v. Reid*, 976 F.3d 708, 715

(6th Cir. 2020). To determine if the award is excessive under the Due Process

Clause, this Court applies three "guideposts" that "tightly constrain the range

of constitutionally acceptable awards": "(1) the degree of reprehensibility of

the defendant's misconduct; (2) the disparity between the actual or potential

harm suffered by the plaintiff and the punitive damages award; and (3) the

difference between the punitive damages awarded by the jury and the civil

penalties authorized or imposed in comparable cases." *Id.* (citation omitted).

Of these, "the 'most important indicium of the reasonableness of a punitive

damages award is the degree of reprehensibility of the defendant's conduct.'"

*Id.* (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419

(2003)).

That factor requires consideration of whether "the harm caused was

physical as opposed to economic; the tortious conduct evinced an indifference

---

[7] The Court based its finding that this case was "exceptional," and therefore merited fees under the Lanham Act, on the punitive damages verdict. *See* Mem. Op., R. 184, PageID#: 3667.

to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident." *Campbell*, 538 U.S. at 419. Here, the erroneous punitive damages instruction makes it is impossible to know whether the jury would have found Defendants' conduct to be sufficiently reprehensible by clear and convincing evidence. But there is reason to doubt that it would: after all, the alleged infringement was not "physical"; this conduct did not "evince[] an indifference to or a reckless disregard of the health or safety of others"; the amount awarded vastly exceeded the amount of revenue that Plaintiffs lost as a result of the infringement (which Plaintiffs never even tried to quantify, *see* R. 159, PageID #2500); and the decision to leave the information on the website was done at the advice of counsel, Tr., R. 155, Page ID #1976, not as "the result of intentional malice, trickery, or deceit." *Campbell*, 538 U.S. at 419. Where, as here "few, if any, of the indicia of reprehensibility are present, the defendant's conduct is not considered sufficiently 'reprehensible,' for purposes of due process, to support any award." *Kidis*, 976 F.3d at 715.

The court largely avoided this due-process analysis by concluding that it could aggregate the compensatory damages awarded under the Lanham Act

and the state unfair competition claim when considering whether the award was constitutionally "excessive." But that, too, was error.

Here, virtually all the compensatory damages were awarded under the Lanham Act, *which does not permit punitive damages*. *See* 15 U.S.C. § 1117(a) (awards under the Lanham Act "shall constitute compensation and not a penalty"); *Duncan v. Stuetzle*, 76 F.3d 1480, 1490 (9th Cir. 1996) (no punitive damages under Lanham Act). By allowing "aggregation" of these claims, the trial court effectively allowed Plaintiffs to graft onto the federal law something that Congress prohibited. Instead, the court should have examined whether the $67,649.82 punitive damages award was excessive compared to the $1 the jury awarded on the state unfair-competition claim—which it plainly was. *See, e.g.*, *Kidis*, 976 F.3d at 717 ("Yet even where we might loosen *State Farm*'s tight constitutional vise on high-ratio awards, we customarily still reduce the punitive damages award 'so that the ratio of punitive to compensatory damages' is, at the very most, 'in the single digits.'. . . And those high ratios, it bears reminding, are reserved for cases with exceedingly reprehensible conduct." (internal citation omitted)).

The cases that the court cited for combining different compensatory awards for purposes of the due-process question do not suggest otherwise: those cases did not combine awards where one of the claims prohibits punitive

46

awards, like the Lanham Act does. Moreover, even the primary case that the court cited, *Fastenal Co. v. Crawford*, 609 F. Supp. 2d 650, 660 (E.D. Ky. 2009), recognized that courts disagree on whether to aggregate different damages awards when considering whether a punitive damages award comports with due process.

## III. House Is Liable for Breach of the License Agreement, and Players' Dugout Is Not.

The district court should have granted Players' Dugout's mid-trial Rule 50 motion as to both sides' claims for breach of the License Agreement. This Court reviews the district court's denial of that motion de novo. *Williams v. Nashville Network*, 132 F.3d 1123, 1130 (6th Cir. 1997). Motions for judgment as a matter of law should be granted in cases where "it is clear that reasonable people could come to but one conclusion from the evidence." *Lewis v. City of Irvine,* 899 F.2d 451, 454–55 (6th Cir.1990). Notwithstanding the jury's verdict, this is just such a case.

### A.   House Breached the Agreement First.

All parties agreed that the License Agreement was a valid contract and that it required House (1) "to promptly report to [Players' Dugout] known or suspected attempts by third parties to sell or market the PAJTT program who do not have a contractual relationship with [Players' Dugout]"; and (2) to serve notice "on such parties that they are not authorized to sell or market the

47

PAJTT program." License Agreement, R. 51-1, PageID #514. If House "makes no meaningful effort to stop or otherwise prevent such piracy," Players' Dugout is entitled to receive $500,000 in "liquidated damages." *Id.*

There is no question that House breached that provision of the contract. On numerous occasions throughout 2014 and 2015, Players' Dugout notified House of known attempts to market the PAJTT program by unauthorized persons. Tr., R. 155, PageID #2026–27; 6/2/2015 Email, R. 51-8, PageID #581; Tr., R. 161, PageID #2660; 11/4/2014 Email, R. 51-6; 11/8/2014 Email, R. 51-7. Some of these "pirates" made overt references to the Delabar story and the HBO special featuring the PAJTT program. When asked whether he contacted any of the suspected offenders, House testified, "I feel no need to call those people." Tr., R. 159, PageID #2488. House was fine with unauthorized distributors advertising that they were using PAJTT because, in his view, "There's no such thing as bad advertising." *Id.*, PageID # 2486–87.

At trial, House attempted to excuse his refusal to abide by the terms of the contract. In his view, the people whom Joe and Joseph suspected of pirating the PAJTT program, by definition, could not be pirating the program because House didn't personally teach them how to use PAJTT correctly: "If I don't know who he is, he's got no chance of writing a program that has to do with Personally Adaptive Joint Threshold Training. If he's never been around

us, he can't possibly have it." *Id.*, PageID #2491. According to House,
"[n]obody knew" how to use PAJTT correctly "except the Newtons, Tom
House, and Jamie Evans." *Id.*, PageID 2486. So, when asked whether he had
investigated suspected offenders, he replied, "Why would I investigate when I
knew? Who are the only people on the planet that could do the program? The
Newtons, Jamie Evans, and me." *Id.*, PageID 2489.

Of course, that argument does not comport with the Agreement's plain
terms. The Agreement requires House to serve notice on *any* "third parties"
who are "known or suspected" of attempting to "sell or market the PAJTT
program" without contracting with Players' Dugout. License Agreement, R.
51-1, PageID #514. And at least some of the third parties identified by the
Newtons in 2014 and 2015 were reasonably suspected of doing that. The
contract does not say that House need only concern himself with ensuring that
he, Joe Newton, and Evans refrain from pirating the program; that would be
absurd and would render worthless the "exclusive worldwide license" granted
to Players' Dugout. *See Wonderfoil, Inc. v. Russell*, 630 S.W.3d 706, 710 (Ky.
2021) ("[A] court should not, if possible, adopt a construction that renders a
provision meaningless or ineffectual or interpret a provision in a manner that
brings about an absurd or unreasonable result").

But even this untenable excuse cannot save House from a finding of breach. House admits that he never attempted to stop Jamie Evans from pirating the program despite his awareness that Evans was, indeed, marketing and selling PAJTT. 6/2/2015 Email, R. 51-8, PageID #581; Tr., R. 155, PageID #2096; Maryland Injuries Email, R. 71-9. House testified, "So Jamie was doing it [in Maryland]. It's the same basic protocol that Joseph was doing here in Kentucky." R. 159, PageID #2457. And when asked whether he ever told Evans to stop marketing PAJTT without Players' Dugout's permission, House was defiant: "Why should I? I told him, 'Do what you want to do.'" R. 159, PageID #2458. House thus admitted that he knew in 2014 and 2015 that Evans was pirating the program and that he "ma[de] no meaningful effort to stop or otherwise prevent such piracy." License Agreement, R. 51-1, PageID #514. Those concessions *require* a finding that House breached the Agreement.

It also is undisputed that House's breach predated Players' Dugout's first missed royalty payment in September 2015. Because House breached first, he is liable for liquidated damages. Moreover, his own breach claim fails as a matter of law under the well-established rule that "[t]he party first breaching a contract 'cannot complain if the other party thereafter refused to perform.'" *Nash-Finch Co. v. Casey's Foods, Inc.*, 762 F. App'x 218, 222 (6th Cir. 2018) (quoting *Hall v. Rowe*, 439 S.W.3d 183, 187 (Ky. Ct. App. 2014)).

50

## B.    Players' Dugout Did Not Waive the Breach.

At the JMOL stage, House raised a waiver defense. He argued that, because Players' Dugout continued to make royalty payments even after he breached the contract, it waived any right to enforce that provision in the future. But "[w]aiver requires proof of a knowing and voluntary surrender or relinquishment of a known right." *Robinson v. Beard*, 2017 WL 3498755, at *2 (Ky. Ct. App. July 28, 2017) (quoting *Moore v. Asente*, 110 S.W.3d 336, 359 (Ky. 2003)). And, under the express terms of the License Agreement, there is only one way to waive a contractual right: in a writing signed by both parties. *See* R. 51-1, PageID #517, Section 12(b).

Waiver is an affirmative defense, and the party asserting it bears the burden of proof. Fed. R. Civ. P. 8(c)(1). House never introduced any signed writing that purports the waive Players' Dugout's rights under Sections 3(c), 3(d), and 11(e) of the License Agreement. Therefore, no waiver occurred.

This Court should reverse the district court's denial of Players' Dugout's motion for judgment as a matter of law as to the contract claims and should remand with instructions to enter a judgment in Players' Dugout's favor.

**IV.  The Jury Should Have Been Permitted to Hold House Personally Liable for Defamation.**

   **A.  House Ratified the NPA's Defamatory Communication.**

The jury rightly concluded that the NPA's defamatory email devastated Players' Dugout's business and awarded damages against the NPA under a defamation *per quod* theory. But the district court refused to allow the jury to consider whether House himself ought to be held liable for those damages.

That was legal error. "A district court's refusal to give a requested jury instruction constitutes reversible error if: (1) the omitted instructions are a correct statement of the law; (2) the instruction is not substantially covered by other delivered charges; (3) the failure to give the instruction impairs the requesting party's theory of the case." *Hisrich v. Volvo Cars of North America., Inc.*, 226 F.3d 445, 449 (6th Cir. 2000) (quotation marks omitted). Here, each element was met.

Defendants' request for a ratification instruction relied on a correct statement of the law. "'Ratification' is the affirmance of a prior act done by another whereby the act is given effect as if done by an agent acting with actual authority." 3 Am. Jur. 2d *Agency* § 167. Thus, even crediting House's claim that he had no advance knowledge of the defamatory email, if he, as the principal, approved the statements made by his agents after the fact, then he is "bound by the agent's unauthorized act." *Id.* Ratification can sound in

"contract or tort," *Kindred Nursing Centers Ltd. P'ship v. Brown*, 411 S.W.3d 242, 250 (Ky. Ct. App. 2011)—including in defamation cases. *See Pennsylvania Iron Works Co. v. Henry Vogt Mach. Co.*, 96 S.W. 551 (Ky. 1906). It may be "implied by the conduct of the employer," and it requires a showing of two elements: "1) an after-the-fact awareness of the conduct; and 2) an intent to ratify it." *Saint Joseph Healthcare, Inc. v. Thomas*, 487 S.W.3d 864, 875 (Ky. 2016).

Both elements are satisfied here. There is no question, given his testimony at trial, that House was aware of the defamatory email after the fact. *See* Tr., R. 159, PageID #2395. Moreover, House's failure to retract the defamatory statement—and thus, his willingness to see Players' Dugout destroyed by it—shows that he intended to ratify the defamation. Indeed, it is a long-standing principle of Kentucky law that, when an agent makes a defamatory statement, and the principle refuses to disavow it after the fact, that refusal itself constitutes "ratification and approval of its contents," and the principle is liable for the acts of its agent. *Henry Vogt Mach. Co.*, 96 S.W. at 554. That is true even if no "express ratification" ever occurs. *Id.* at 553.[8]

---

[8] In denying Defendants' motion for a new trial, the district court stated that the record lacks any testimony showing that Adornato and Marney were agents of House. But that is incorrect. House testified that he was in charge of NPA, Tr., R. 159, PageID #2417, and unilaterally fired both Marney and Adornato, *id.*, PageID #2381; *see also* Tr., R. 161, 2653.

House readily admitted at trial that he never retracted the defamatory statements in the October 26 email:

> Q. Have you ever retracted the false statement made about the injuries to the Newtons' customers?
>
> A. Not by mail or email or whatever but in meetings around. We deal a lot personally as you mention with family and there's been times I said just, you know, go with the flow. We're just going to kind of move forward from here.
>
> Q. Speak up a little.
>
> A. Want me to get closer? To shorten things, no.
>
> Q. No what?
>
> A. No. I haven't gone around or pointed out that there's a retraction.

R. 159, PageID #2395–96.

And in any event, House himself assumed responsibility for the defamatory statements when he said at trial:

> [E]ven though [Marney and Adornato] wrote the letters at not necessarily the time I would write them, but they wrote the letters, it doesn't dismiss the fact that [the Newtons] weren't playing by protocols that I believed in the agreement were necessary. So yes I let the NPA coaches know.

R. 159, PageID #2384. Thus, when Marney and Adornato "let the NPA coaches know" about the (false) reports of injuries attributable to Players' Dugout, it was the equivalent of Tom House "let[ting] the NPA coaches know." *Id.*

54

Second, the ratification instruction is not substantially covered by other delivered charges. There is no other charge holding House personally liable for his role in the defamatory statements that brought about the demise of the Newtons' business.

Third, the failure to give the instruction impairs Defendants' theory of the case because it places the principal culprit for their injuries beyond the reach of their claims. The Court should remand the case for a new trial on the question of whether House ratified the NPA's defamatory statements. *Ivey v. Wilson*, 832 F.2d 950, 955 (6th Cir. 1987) ("The reversal of a jury verdict due to erroneous jury instructions frequently necessitates a new trial").

### B.    The District Court Should Have Included a Jury Instruction on the Question of House's Liability for Slander *Per Se*.

The court's failure to allow an instruction against Tom House fails for another reason as well: the evidence offered at trial showed that he, personally, committed slander *per se* against the Newtons.

On October 10, 2015, House made defamatory statements about Defendants to Bill Schopp.  Specifically, he told Schopp that Players' Dugout's training methods were "hurting a lot of arms." *Id.*, PageID #3153. By accusing the Newtons of injuring the young athletes who came to them for help, Dr. House committed slander *per se*. *See Stringer v. Wal-Mart Stores, Inc.*, 151 S.W.3d 781, 795 (Ky. 2005) (spoken words are slanderous per se if "they impute . . .

unfitness to perform duties of office"). That is consistent with the district court's holding at the summary judgment stage, when it allowed plaintiff's defamation *per se* claim to go forward: "A trainer who hurts his clients is unfit to perform his job, and Kentucky appellate courts have repeatedly found *per se* defamation when 'a communication involv[es] false allegations of unfitness to perform a job.'" R. 78, PageID #905.

When preparing the final jury instructions, however, the court refused repeated requests from Defendants to include Dr. House in a defamation *per se* jury instruction.[9] The court rejected that request because it did not believe Defendants had offered direct proof that they were *harmed* by the defamatory statements. *See* Tr., R. 162, PageID#: 2923-24. But the law does not require such a showing; rather, "[w]hen there is a claim of slander *per se*, 'there is a conclusive presumption of both malice and damage.' . . . . Therefore, 'damages are presumed and the person defamed may recover *without allegation or proof of special damages.*'" *Disabled American Veterans v. Crabb*, 182 S.W.3d 541, 547 (Ky. Ct. App. 2005).

---

[9] *See, e.g.*, Tr. 7, R. 162, PageID #2907 ("The other half of our argument is . . . he too was doing defamation when he told Mr. Schopp the Newtons were injuring people."); PageID #2913 ("Dr. House was committing the libel also. . ..")); PageID #2921 ("THE COURT: . . . you want essentially what would be a slander claim for defamation here based on the testimony in the deposition this morning?"); PageID #2922 ("So are you wanting the claim to be against NPA and Dr. House? MR. WHEAT: Yes, Your Honor.").

Here, the court's refusal to give a *per se* instruction against House, personally, was a mistake of law. *See, e.g.*, *White v. Steele*, 629 F. App'x 690, 695 (6th Cir. 2015) ("Accordingly, trial courts 'should give a requested instruction if it is supported by the evidence, embodies a party's theory, and is a correct statement of the law."); *United States v. Triana*, 468 F.3d 308, 315 (6th Cir. 2006) ("A district court must grant an instruction on the defendant's theory of the case if the theory has some support in the evidence and the law."). Therefore, the Court should reverse and remand the case for a new trial on the defamation claims.

## CONCLUSION

For the foregoing reasons, the Court should (1) reverse the district court's denial of Defendants' motion for judgment as a matter of law as to the contract claims; (2) vacate the district court's award of profits to Plaintiffs under the Lanham Act; (3) vacate the district court's award of punitive damages for Plaintiffs' state-law trademark and unfair-competition claims; and (4) remand for a new trial on the following four issues: (a) the amount of profits due under the Lanham Act; (b) the correct measure of punitive damages for Defendants' state-law trademark and unfair-competition claims; (c) whether House ratified the NPA's defamatory email communication; and (d) whether House is personally liable for slander *per se*.

Respectfully submitted,

*/s/ Michael P. Abate*
Michael P. Abate
Burt A. (Chuck) Stinson
KAPLAN JOHNSON ABATE & BIRD LLP
710 West Main Street, 4th Floor
Louisville, KY 40202
Tel: (502) 416-1630
mabate@kaplanjohnsonlaw.com
cstinson@kaplanjohnsonlaw.com

### CERTIFICATE OF COMPLIANCE

I certify that the foregoing document complies with Fed. R. App. P. 32(a)(5) and 32(a)(7)(B) because it was prepared using Calisto MT 14-point type and contains 12,991 words.


s/ Burt A. Stinson

*Counsel for Appellants*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 30, 2022, I filed a copy of the foregoing brief and served it on all parties by filing it through the Court's CM/ECF System. Counsel for all parties are registered ECF users.

s/ Burt A. Stinson
*Counsel for Appellants*

ADDENDUM

The following are hereby designated as relevant documents from the trial

court record:

| Record No. | Description | Page ID |
|---|---|---|
| 5-1 | Adornato Letter | 72 – 74 |
| 37-4 | Termination Letter | 214 – 218 |
| 39 | Amended Complaint | 235 – 253 |
| 51-1 | License Agreement | 512 – 518 |
| 51-5 | House Letter | 578 |
| 51-6 | 11/4/2014 Email | 579 |
| 51-7 | 11/8/2014 | 580 |
| 51-8 | 6/2/2015 Email | 581 – 582 |
| 51-10 | NPA Email | 597 – 598 |
| 71-9 | Maryland Injuries Email | 838 – 840 |
| 78 | Summary Judgment Order | 886 – 912 |
| 109 | Plaintiffs' List of Trial Exhibits | 1177 – 1182 |
| 116 | Proposed Instructions | 1200 – 1328 |
| 143 | Verdict | 1520 – 1583 |
| 153 | Transcript of Jury Trial Vol. 2 | 1709 – 1915 |
| 155 | Transcript of Jury Trial Vol. 3 | 1919 – 2126 |
| 157 | Transcript of Jury Trial Vol. 4 | 2130 – 2293 |
| 159 | Transcript of Jury Trial Vol. 5 | 2297 – 2534 |
| 161 | Transcript of Jury Trial Vol. 6 | 2538 – 2822 |
| 162 | Transcript of Jury Trial Vol. 7 | 2823 – 2953 |
| 164 | 1/12/2022 Judgment | 2956 – 2960 |
| 166 | Transcript of Jury Trial Vol. 8 | 2967 – 3136 |
| 168 | Exhibit Inventory | 3140 – 3141 |
| 169-1 | Schopp Depo. | 3144 - 3191 |
| 170-1 | Post-Trial Motion | 3196 - 3222 |
| 179-1 | Letter | 3512 – 3515 |
| 183 | Order Granting Mot. to Supplement Trial Record | 3633 – 3634 |
| 184 | Order Denying Renewed Motion for Judgment as a Matter of Law or for a New Trial | 3635 – 3678 |
| 185 | Notice of Appeal | 3679 – 3680 |