No. 22-5843

## UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

THOMAS HOUSE, ET AL.,

*Plaintiffs- Appellees*

v.

PLAYERS' DUGOUT, INC., ET AL.,

*Defendants-Appellants*

On Appeal from the United States District Court
for the Western District of Kentucky
Case No. 3:16-cv-00594

**BRIEF OF APPELLEES**

Michael A. Valenti, Esq.
Hayden A. Holbrook, Esq.
Valenti Hanley PLLC
401 W. Main Street, Suite 1950
Louisville, KY 40202
Telephone: (502) 568-2100
mvalenti@vhrlaw.com
hholbrook@vhrlaw.com

# DISCLOSURE OF CORPORATE AFFILIATIONS AND FINANCIAL INTEREST

Sixth Circuit Case No.: 22-5843

Case Name: <u>Thomas House, et al. v. Players' Dugout, Inc., et al.</u>

Name of Counsel: <u>Michael A. Valenti</u>

Pursuant to 6th Cir. R. 26.1, National Pitching Association, Inc. makes the following disclosures:

1. It said party is a subsidiary or affiliate of a publicly-owned corporation?

   Response: <u>No.</u>

2. Is there a publicly-owned corporation, not a party to the appeal, that has a financial interest in the outcome?

   Response: <u>No.</u>

Dated: February 3, 2022

<u>/s/ Michael A. Valenti</u>
Michael A. Valenti
Counsel for Appellees

i

## TABLE OF CONTENTS

Disclosure of Corporate Affiliations and Financial Interest......................................i

Table of Contents ................................................................................................. ii

Table of Authorities ..............................................................................................iv

Statement Regarding Oral Argument ....................................................................vi

Statement of the Case............................................................................................1

I. Statement of Facts .............................................................................................1

    A. The PAJTT Program..................................................................................1

    B. The License Agreement.............................................................................2

    C. PDI's Breach of the License Agreement....................................................4

    D. Appellants' Noncompliance with the Protocols of the PAJTT Program...5

    E. Dr. House's Termination of the License Agreement and Appellant's
    Continuing Use of House's Name and the NPA Trademark ....................6

    F. Gary Adornato's Communications with PDI and Alex Marney's Email ..8

Summary of the Argument....................................................................................10

Argument.............................................................................................................10

I. Defendants are Not Entitled to a New Trial with Respect to the Jury's Award for
Damages under the Lanham Act ...........................................................................10

A. The Evidence Supports the Jury's Finding that Defendants' Sales of the
Velocity Plus Program Were Sufficiently Attributable to Plaintiffs' Lost Profits
Damages .............................................................................................................10

B. The District Court Did Not Abuse Its Discretion in Allowing Plaintiffs to
Present Evidence of Damages .............................................................................22

II. The Punitive Damages and Fees Awards in Plaintiffs' Favor Are Not Fatally
Flawed ...............................................................................................................28

A. Regardless of Whether the Punitive Damages Instruction Should Have Used
"Clear and Convincing Evidence" Language, the Jury's Punitive Damages Award
Should Not Be Overturned .................................................................................28

B. The Punitive Damages Award Is Not Constitutionally Excessive ....................32

III. Defendants are Not Entitled to Judgment as a Matter of Law on Their Claim
for Breach of Contract .......................................................................................33

A. House Did Not Breach the License Agreement .................................................33

B. Defendants' Waiver Argument is Irrelevant and was Not Preserved ...............43

IV. The District Court Properly Refused to Give Instructions to the Jury Permitting House to be Personally Liable Under Defendants' Defamation Claims ...............43

A. House Did Not Ratify Any Defamatory Statements ..........................................43

B. House Cannot Be Liable to Slander *Per Se* .......................................................47

Conclusion .............................................................................................................50

Certificate of Compliance .....................................................................................51

Certificate of Service ............................................................................................52

Addendum...............................................................................................................

# TABLE OF AUTHORITIES

## *Cases*

*Anderson v. Wade*, 33 F. Appx 750 (6th Cir. 2002) .................................................30

*Barnes v. City of Cincinnati*, 401 F.3d 729 (6th Cir. 2005) ....................................34

*Black v. Ryder/P.I.E. Nationwide*, 15 F.3d 573 (6th Cir. 1994).......................10, 29

*Braun v. Ultimate Jetcharters, LLC*, 828 F.3d 501 (6th Cir. 2016) ................12, 34

*Disabled American Veterans v. Crabb*, 182 S.W.3d 541 (Ky. App. 2005) ...........49

*Hisrich v. Volvo Cars of North America, Inc.*,
    226 F.3d 445 (6th Cir. 2000) ................................................................44, 50

*HLV, LLC v. Van Buren City, 775 F. Appx. 204* (6th Cir. 2019) ...........................23

*Karam v. Sagemark Consulting, Inc.*, 383 F.3d 421 (6th Cir. 2004) ......................34

*Kindred Nursing Centers Ltd. P'ship v. Brown*,
    411 S.W.2d 242 (Ky. App. 2011) ....................................................................44

*King v. Ford Motor Co.*, 209 F.3d 886 (6th Cir. 2000) ..........................................22

*Max Rack, Inc. v. Core Health & Fitness, LLC*,
    40 F.4th 454 (6th Cir. 2022).....................................................................18, 20

*Maxwell v. Dodd*, 662 F.3d 418 (6th Cir. 2011).....................................................33

*Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*,
    316 U.S. 203 (1942).........................................................................................21

*Pennsylvania Iron Works Co. v. Henry Vogt Mach. Co.*,
    96 S.W. 551 (Ky. 1906)...................................................................................45

*Radvansky v. City of Olmsted Falls*, 496 F.3d 609 (6th Cir. 2007).................. 34-35

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000) .........................35

*S. Ry. Co. v. Miller*, 285 F.2d 202 (6th Cir. 1960)............................................. 12-13

*Saint Joseph Healthcare, Inc. Thomas*, 487 S.W.3d 864 (Ky. 2016).....................44

*Smith v. Rock-Term Servs., Inc.*, 813 F.3d 298 (6th Cir. 2016)..............................34

*Summers v. Keebler Co.*, 133 F. App'x 249 (6th Cir. 2005) ...................................12

*U.S. ex rel. A+ Homecare, Inc. v. Medshares Mgmt. Grp.*,
    400 F.3d 428 (6th Cir. 2005) ................................................... 12-13

*Unitherm Food Sys. v. Swift-Eckrich, Inc.*, 546 U.S. 394 (2006)..................... 33-34

*Wesley v. Campbell*, 864 F.3d 433 (6th Cir. 2017)...................................................28

*Wynn Oil Co. v. Am. Way Serv. Corp.*, 943 F.2d 595 (6th Cir. 1991).....................21

*Young v. Langley*, 793 F.2d 792 (6th Cir. 1986) .....................................................28

*Zachar v. Lee*, 363 F.3d 70 (1st Cir. 2004).........................................................33-34

### Rules and Statutes

Fed. R. Civ. P. 37(c)(1)..............................................................................................23

Fed. R. Civ. P. 59 ......................................................................................................33

KRS 411.184 ........................................................................................................28, 30

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs Thomas House and National Pitching Association, Inc., do not believe that oral argument would assist the court in resolving the legal and factual issues raised by this appeal.

## STATEMENT OF THE CASE

**A. The PAJTT Program.**

In or around 2010, House developed an arm care program known as the Personally Adaptive Joint Threshold Training Program (the "PAJTT Program"). The PAJTT Program was born out of a peer reviewed study which Dr. House conducted with assistance from his colleagues in an effort to alleviate a condition known as "GIRD" which impeded the motion of the throwing arm. Tr., R. 155 Page ID #2058. The crux of the study was a sequence of throws and "holds" of different weighted balls from various throwing positions. The net result of the regimen was that it relieved the GIRD condition.  However, there was also a side benefit to the regimen, which was that if the sequence was performed properly the throwing velocity of the athlete significantly increased. Tr., R. 155 Page ID #2058-2061.

The proprietary part of the PAJTT Program which made it personally adaptive was the ability to test an athlete's throwing velocity with a radar gun when throwing various weighted balls in sequence *after the athlete achieved baseline joint strength and integrity,* identify the "spreads" or differences in the throwing velocity of each ball, and then after evaluating the spreads, write an individualized program for the athlete to increase shoulder strength and throwing velocity, while reducing the likelihood of injury. House developed an algorithm to measure spreads and write individualized programs for athletes. The basic training protocols (3 holds, 2 throws)

1

preceding such an individualized program have been taught by Dr. House at NPA certification clinics since 2002. Tr., R. 157 Page ID #2255-2266.

### B. The License Agreement

In early 2014, Defendants retained an attorney to draft a License Agreement with Dr. House for the PAJTT Program. Defendants told their attorneys to insert a provision in the License Agreement that a patent had already been issued on the PAJTT Program, even though Dr. House nor anyone else represented to the Defendants that a patent had already been issued. Tr., R. 155, Page ID #2084; Tr., R. 151, Page ID #1674, 1683. In February 2014, the Newtons flew to Southern California and presented Dr. House with a copy of the License Agreement. Dr. House, being a self-described "terrible businessman", gave a cursory review of the License Agreement and then signed it. Tr., R. 155, Page ID #2091. In February 2014, Dr. House and PDI entered into a License Agreement in which Dr. House granted PDI to use Dr. House's "know-how", to the extent Dr. House had the right to license such "know-how", to commercialize the PAJTT Program under the name of "Velocity Plus Arm Care Program". (the "License Agreement"), R. 51-1, Page ID #512-518. However, no Exhibit A listing the actual "know-how" that was licensed was ever prepared by Defendants or attached to the License Agreement. Joe Newton has acknowledged that the License Agreement did not cover basic training protocols with weighted balls and other items already in the public domain. Tr., R. 151, Page

ID #1674, 1681. The License Agreement does not explicitly provide for Defendants to use the NPA Trademark or Dr. House's name as part of the commercialization of the PAJTT Program. But during the period in which PDI was in compliance with the License Agreement, Dr. House permitted PDI to use the NPA Trademark and Dr. House's name and reputation to promote and market the Velocity Plus Program. Tr., R. 161, Page ID #2591. Contrary to the misrepresentation in Defendants' brief at p. 12, Dr. House, through counsel, submitted a provisional patent application for the PAJTT Program in January 2013, long before the License Agreement was entered into. *Id.*, Page ID #2597-98.

Under the License Agreement, PDI was required to pay royalties and commissions to Dr. House on the 10th day of each month. R. 51-1, Page ID #513-14. The Agreement required PDI to maintain and submit reports showing the royalties and commissions payable during the preceding month with supporting information. *Id*. The License Agreement also required PDI to maintain records in enough detail to determine royalties and commissions payable under the Agreement, as well as to permit Dr. House or a designee to examine the records during the term of the Agreement and two years thereafter. *Id*.

In setting up PDI's website, Joseph took biographical information about Dr. House and NPA from NPA's website and copied it onto PDI's website because he wanted to use that information to promote and sell the Velocity Plus Program. He

3

also requested that a link to PDI's website be sent to all NPA coaches to facilitate the sale of the Velocity Plus Program, which was done. Tr. R. 161, Page ID #2589-90. PDI's website was the vehicle used to promote and sell the Velocity Plus Program Tr., R. 161, Page ID #2723.

### C. PDI's Breach of the License Agreement

PDI stopped both paying royalties and commissions and complying with its reporting obligations in August 2015. Tr., R. 161, Page ID #2593. PDI continued to use the NPA Trademark and Dr. House's name on its website and other promotional materials, and to supply participants with weighted ball kits bearing the NPA trademark as part of the Velocity Plus Program. Tr., R.153, Page ID #1719-21, 1770-72; Tr., R. 161, Page ID #2650.

Marie House, Dr. House's wife who helped him with accounting and administrative matters, contacted Joseph Newton in September 2015 about the missed royalty payments and the fact that NPA coaches were complaining that their athletes had not received the personalized training programs they had bought and paid for. Tr., R. 161, Page ID #2593-94. Joseph apologized to Marie and told her he had been busy with other matters and promised that PDI would get current on the payments immediately but that never happened. *Id.* Contrary to the representation in Appellant's Statement of the Case at p. 19, PDI did not create an account in Dr. House's name in which it deposited the unpaid royalty checks each month. Tr., R.

4

155, Page ID #1927-28. **Moreover, at no time prior to the filing of this lawsuit did either of the Newtons inform Dr. House or Marie verbally or in writing that they considered Dr. House to be in breach of the License Agreement for any reason.** Tr., R. 161, Page ID #2595-96; Tr., R. 151, Page ID #1721-23. In fact, in February 2016 when Dr. House sent PDI a written notice of default and intent to terminate the License Agreement, Joe Newton still thought the Agreement "was going well." and considered Dr. House to be a "good partner". Tr., R. 153, Page ID 1734.

### D. Defendants' Noncompliance with the Protocols of the PAJTT Program

In the spring of 2015, Dr. House began to hear rumblings from NPA coaches that PDI was not following the proper protocols for the PAJTT Program. Specifically, PDI was testing too early for velocity before the athlete had achieved the requisite functional joint integrity and was not conducting the tests with the correct sequence of balls. Tr., R. 155, Page ID #2092, 2097-99, 2104-06; Dr. House had several telephone calls with the Newtons during this period in which he informed them that they were testing too early for velocity before all the requisite protocols were completed, and that he was not able to defend their work if they continued to do so. *Id.* at Page ID #2106; Tr., R. 161 Page ID #2599-2600. Eventually, Dr. House and Alex Marney, who worked for NPA at the time, flew out to PDI's facility in April 2015 to reinforce to the Defendants the proper protocols

5

for the program and that they needed to get in compliance. Tr., R. 155 Page ID #2098; Tr., R. 159 Page ID #2456, 2459.

### E. Dr. House's Termination of the License Agreement and Appellant's Continuing Use of Dr. House's Name and the NPA Trademark

In February 2016 Dr. House sent a letter notifying PDI that it was in default under the License Agreement and that he intended to terminate the Agreement unless PDI corrected the problem. PDI did not respond to the letter disputing that it was in default. Nor did it claim that Dr. House was in breach of the Agreement for any reason.

In a follow up call with Joe Newton, Dr. House advised him that PDI was free to market its own Velocity Program which deviated from the PAJTT Program so long as it paid up on the unpaid royalties owed to him and stopped using Dr. House's name and the NPA trademark to sell its program. Tr., R. 157 Page ID #2250. Defendants simply ignored Dr. House's request, however, and continued to feature Dr. House's name, photo, and NPA's trademark on their website to promote and market the Velocity Plus Program. Tr., R. 155 Page ID #1974-75.

On June 29, 2016, Dr. House terminated the License Agreement through a letter from his counsel[1] and demanded that they immediately cease and desist using Dr. House's name or NPA's name in connection with its marketing and promotional

---

[1] The Parties stipulated at trial that June 29, 2016 was the termination date of the Agreement.

materials and on its website. R. 37-4. Page ID #215-218. Defendants ignored Dr. House's demand, necessitating the filing of a motion for preliminary injunction in July 2017 by him, in an effort to compel them to cease their infringing activities. R. 17. Defendants elected not to oppose and respond to Dr. House's motion. Instead, they represented that they had "voluntarily" removed Plaintiffs names and marks from their website and promotional materials and agreed to enter into a stipulation that they would no longer utilize Plaintiffs names and trademark except for the liquidation of remaining ball kits having the NPA Trademark imprinted thereon. Agreed Order, R. 31.

Nearly four years later, Plaintiffs discovered that Defendants were still selling weight ball kits displaying the NPA trademark, through another entity called Throw Smart, LLC.  PDI did not liquidate balls kits, but rather just give them to another entity controlled by the Newtons to be used in Throw Smart's business. The Trial Court acknowledged at trial that it would have been misleading by Defendants' representations that it was going to liquidate the remaining ball kits. Tr., R. 161, Page ID #2782. Plaintiffs learned during trial that Throw Smart, LLC was organized with the Kentucky Secretary of State on September 6, 2017—the day before the parties filed the stipulation which permitted PDI to liquidate the ball kits through its own business. Pl. Motion for Attorney Fees, R. 172-1 Page ID #3334, 3369-74.

7

**F. Gary Adornato's Communications with PDI and Alex Marney's Email**

In the summer of 2015, while Dr. House was struggling with Parkinson's disease, NPA hired a consultant by the name of Gary Adornato and one of Mr. Adornato's assistants to help streamline NPA's business operations. Tr., R. 157 Page ID #2233. On October 13, 2015, Adornato sent a letter to Joe Newton informing him that effective September 15, 2015, he had assumed the position of President and CEO of NPA and would be acting on NPA's behalf from that point forward. Adornato proposed in the letter that NPA and PDI reach an agreement ending the relationship between the two parties and requesting that Defendants cease and desist from using NPA's or Dr. House's name to sell any of its products or services. R. 5-1 Page ID #72-74. Contrary to the representation in Defendants' Brief at p. 17, and as noted by the trial court when discussing the proposed jury instructions, Dr. House did not direct Adornato to send the letter, was not aware that the letter was going to be sent, and did not discuss the letter or its contents with Adornato before it was sent. Tr., R. 157 Page ID #2233-34.

Adornato's letter did not seek to terminate the License Agreement between Dr. House and PDI. Dr. House never authorized Adornato or anyone else from NPA to act on his behalf when it came to the License Agreement or any other matter. R. 159 Page ID #2352. Nor was Dr. House part of any plan or discussion with Adornato or anyone else at NPA to terminate the License Agreement or to have NPA begin

8

commercializing the PAJTT Program. Tr., R. 157 Page ID #2285-86. Following his termination of the License Agreement in June 2016 due to PDI's non-payment of royalties, neither Dr. House nor NPA sought to commercialize the PAJTT Program and Dr. House has received no revenues for writing individualized programs using the algorithms from the PAJTT Program.  Tr., R. 155 Page ID #2114-15.

On October 28, 2015, Alex Marney sent an email to approximately 44 NPA coaches introducing Adornato and providing a statement from Adornato.  In his statement, Adornato announced that NPA was terminating its affiliation with and endorsement of PDI's Velocity Plus Program. Adornato went on to state that as a "possible" result of Defendants' changes and omissions to the protocols of the PAJTT Program which made it safe and effective, NPA had learned that several of PDI's customers had been hurt. NPA Email, R. 51-10 Page ID #597-98; Tr., R. 157 Page ID #2244. Dr. House was not aware of Marney's email before it was sent and had nothing to do with it. Tr., R. 157 Page ID #2235-36; Tr., R. 159 Page ID #2376. NPA's relationship with Adornato and Marney terminated shortly after October 2015. Tr., R. 157 Page ID #2234-35.

## SUMMARY OF THE ARGUMENT

The district court did not commit reversible error in any respect. Defendants failed to preserve many of the arguments they are making on appeal. The district court properly instructed the jury on every issue and the jury's verdict in favor of Plaintiffs was supported by the evidence in all respects.

## ARGUMENT

**I.    Defendants are Not Entitled to a New Trial with Respect to the Jury's Award for Damages under the Lanham Act**

**A.    The Evidence Supports the Jury's Finding that Defendants' Sales of the Velocity Plus Program Were Sufficiently Attributable to Plaintiffs' Lost Profits Damages**

Defendants' arguments concerning the *amount* of jury's award of lost profits to House and NPA under the Lanham Act are not properly before this Court, as they failed to preserve such arguments for appellate review. Such an attempt to raise new grounds for relief should not be well taken, as arguments raised for the first time on appeal are generally not considered. *Black v. Ryder/P.I.E. Nationwide*, 15 F.3d 573, 582 (6th Cir. 1994).

Defendants' secondary argument in their JMOL Motion relating to the jury's verdict under House's and NPA's Lanham Act claims concerned the *amount* of the

lost profits award,[2] based on the contention that "Defendants did a far better job presenting evidence that the net profit would only be a small fraction of that amount." Def. JMOL Motion, R. 170-1 Page ID #3208-09. Specifically, Defendants argued that the lost profits award should have been "considerably less — in the $20,000 range," for two reasons: (i) their expert witness testified that PDI's profit margin was only 8.4%, and (ii) PDI's tax returns for the one of the years in which the infringing activity occurred showed that PDI had a net profit of $23,757. *Id*. Thus, Defendants post-verdict motion centered around the argument that the jury failed to consider evidence of *costs and expenses* which should have been *deducted* from their revenues to reach the lost profits amount. Accordingly, Defendants asked the District Court to grant a *new trial* pursuant to Rule 59(a) on the purported grounds that the "jury has reached a 'seriously erroneous result' by awarding Plaintiffs an excessive verdict *against the clear weight of the evidence*." *Id*. (emphasis added).

At no point in their Rule 50(a) motions, JMOL Motion, or any other time before this appeal did Defendants claim that the evidence was insufficient to show a causal nexus between their *revenues* and infringing activity. Yet this is the argument that Defendants raise for the first time in their Brief. Defendants contend

---

[2] Defendants' primary argument—that Plaintiffs failed to comply with Rule 26 and, accordingly, should have been precluded from any evidence concerning damages—is discussed below, *infra*, pp. 22-27.

that "Plaintiffs make no attempt to tie the profits they sought to the alleged infringement." Def. Brief, p. 26. Contrary to Defendants' argument in their JMOL Motion that the lost profits award was against the weight of the evidence because the jury failed to consider evidence of PDI's *costs and deductions*, they now assert before this Court that the evidence at trial failed to establish a sufficient causal nexus between the infringing conduct and their *revenues*. *Id*. at p. 25-31. Defendants have not preserved the right to make this new argument on appeal. *Summers v. Keebler Co.*, 133 F. App'x 249, 252 (6th Cir. 2005) ("Arguments raised for the first time on appeal are waived").

Moreover, while Defendants argue that the district court abused its discretion by denying their motion for a new trial on the issue of the jury's lost profits award as being *against the weight of the evidence*, their Brief clearly shows that they only challenge the *legal sufficiency* of the evidence supporting the award and all but ask the Court to grant them JMOL under Rule 50. *See* Def. Brief, p. 25 (arguing that the Plaintiffs "failed to satisfy their burden" and that the evidence "was insufficient *as a matter of law* to prove the relevant sales….") (emphasis added). The Sixth Circuit has cautioned that "motions for a new trial should not be used as a loophole for presenting sufficiency arguments that were not properly preserved by a pre-verdict motion for JMOL." *Braun v. Ultimate Jetcharters, LLC*, 828 F.3d 501, 509 (6th Cir. 2016) (citing *U.S. ex rel. A+ Homecare, Inc. v.*

12

*Medshares Mgmt. Grp.*, 400 F.3d 428, 450 n.17 (6th Cir. 2005)); *S. Ry. Co. v. Miller*, 285 F.2d 202, 206 (6th Cir. 1960) ("No motion for directed verdict having been made, the question of the sufficiency of the evidence to support the jury's verdict is not available as a ground for a motion for new trial.") Because Defendants never moved the district court under Rule 50 for JMOL or renewed JMOL on the issue of the legal sufficiency of the evidence supporting the jury's lost profits award under the Lanham Act, especially as it relates to the relationship between the infringing conduct and PDI's revenues, they are precluded from asking this Court to review the legal sufficiency of the evidence on appeal.

Even if Defendants' arguments were not waived, however, the record clearly compels the conclusion that the jury's lost profits award was neither lacking in the requisite evidentiary support nor against the weight of the evidence. Defendants' assert that the only evidence of infringement presented at trial were "fleeting references [to Plaintiffs' marks] on [PDI's] website." Def. Brief, p. 26. First, Defendants' website constituted more than just "fleeting references" to the NPA Trademark and House's name. The website displayed the NPA Trademark next to the phrase, "powered by Tom House," and contained a picture of House above the phrase "Learn more about the people and research behind the" Velocity Plus program. Def. App., PEX 47; Tr., R. 153 Page ID #1719-20. Next to this, it displayed a picture of Steve Delabar, a professional baseball pitcher, with his arm

13

extending towards the camera holding various weighted balls on which the NPA logo was prominently displayed. *Id*.

Defendants attempt to emphasize that PDI "was not an e-commerce business," insinuating that the company's sales of the Velocity Plus program could not have been reasonably related or attributed to the infringing uses of House's name and the NPA Trademark on their website. Def. Brief, p. 28. They purport to categorize referrals from NPA certified coaches and "word-of-mouth marketing through in-person presentations" as "other income streams" to bolster support for their argument that PDI's website had nothing to do with sales of the program which they described as being "powered by" House and the NPA.

A company certainly does not have to be classified solely as an "e-commerce business" to generate revenues from online marketing and promotions. Regardless, Defendants' own testimony and the testimony of their expert belies the assertion that PDI's customers or potential customers did not visit its website in connection with the Velocity Plus program. When asked if he thought House's association with the Velocity Plus program was a valuable marketing resource, Joe testified: "I'm sure it was to some people. People didn't go to the website to see that at the top of our page. They went to the website to see Stevie Delabar. That's what it was intended to do, but we gave credit to Dr. House." Tr., R. 153 Page ID #1727-28. Likewise, Defendants' expert witness, Andrew Chambers, testified:

14

Q. And you were told that players who wanted to do a personalized program came to them through the website, correct?

A. That was one of the -- yeah. That was a way they came to the program, for sure.

Tr., R. 161 Page ID #2723.

Plaintiffs also note that throughout trial, Defendants claimed that *the only reason* PDI's website used House's name and the NPA Trademark to promote the Velocity Plus program was to give Plaintiffs "credit," not to promote and market their product. *See*, Tr., R. 151 Page ID #1657; Tr., R. 153 Page ID #1728, 1773-74. Yet, despite numerous demands from Plaintiffs to cease the unauthorized use of their names and marks, Defendants continued to use Plaintiffs' marks on its website until September 2017—*two years* after they stopped paying royalties to Dr. House under the License Agreement and *a year after Plaintiffs filed suit* seeking damages and injunctive relief under the Lanham Act. It was not until after Plaintiffs moved for a preliminary injunction with respect to such unauthorized use of the marks that Defendants elected to remove House's name and the NPA Trademark from their website. Plaintiffs submit that this dubious excuse for Defendants' continued unauthorized use of Plaintiffs' marks on PDI's website shows that *even they believed* the conveyance of an association with Dr. House and the NPA was the primary means to generate sales of the Velocity Plus program.

Second, Defendants' website was not the only evidence of infringement. Ironically, the two examples of referrals from NPA coaches and word-of-mouth marketing offered by Defendants—the presentation Joe gave in Orlando to thousands of coaches and Bill Schopp's testimony that he learned of the Velocity Plus program through an in-person clinic taught by Joe—actually shows that they used House and NPA to market and promote the Velocity Plus program beyond just the website. At the 2014 ABCA conference in Orlando, Joe Newton presented the Velocity Plus program on stage *with Dr. House*. Tr., R. 153 Page ID #1878-79; *see also id*. at Page ID #1880-83 (discussing other conferences and certifications in which Joe Newton promoted the Velocity Plus program with House). Likewise, the clinic at which Bill Schopp learned of the Velocity Plus program was an NPA certification that took place at House's facility at the University of Southern California. R. 169-1 Page ID #3148-50. Schopp attended these certifications because of Dr. Houses reputation as a "guru" and '[t]he arm doctor. The arm expert." *Id*.

Defendants further argue that the testimony of NPA's corporate representative, Marie House, was insufficient to establish the "reasonable relationship" between Defendants' infringement and their revenues because she "simply pointed to royalty reports showing the total sales for the PAJTT Program from November 2015…until July 2017." Def, Brief, p. 27. This is simply not true.

16

Plaintiffs' calculation of Defendants' revenues for purposes of the lost profits claim was accomplished using PDI's monthly reports concerning sales of the Velocity Plus program. Marie testified that using these monthly reports, she calculated the gross revenues that PDI earned from selling individualized PAJJT programs during the period of infringement, albeit incomplete (*see infra*). Tr., R. 161 Page ID #2612. The monthly reports, however, did not even provide PDI's revenues. Rather, because the monthly reports set forth the precise number of "new" and "return" players that purchased the Velocity Plus program for each given month, and because Defendants charged $455 and $295 for each Velocity Plus Program sold to new and returning players throughout the infringing period, respectively, Plaintiffs were able to calculate the total revenues earned from the Defendants' sale of the Velocity Plus Program by simply multiplying the number of programs sold to new participants by $455, plus the number of programs sold to returning participants by $295. *See* Pl. JMOL Response, R. 179 Page ID #3491.

Importantly, this calculation provides Defendants' revenues over the infringing period from *only that single revenue stream*, *i.e.*, sales of the Velocity Plus program. It excludes all other sources of Defendants' revenue over the period of infringement, and instead solely depicts the monies earned by Defendants from sales of the Velocity Plus program. This undoubtedly has a sufficient causal nexus, or reasonable relationship, to Defendants' profits derived from their infringing

17

activity. At the very least, it is certainly enough that a finder of fact could reasonably conclude that the revenues were attributable to Defendants' unauthorized use of Plaintiffs' marks.

Defendants explain that a plaintiff "likely cannot place an infringer's corporate income tax return in the record and rest [its] case for an award of infringer's profits." Def. Brief, p. 30 (citing *Max Rack, Inc. v. Core Health & Fitness, LLC*, 40 F.4th 454, 472 (6th Cir. 2022)). "Rather, it must make at least a threshold showing that the sales figures it points to have some casual nexus to the alleged infringement." *Id*. As set forth above, Plaintiffs did not simply point to PDI's corporate tax returns to establish Defendants' revenues. Ironically, however it is *Defendants who attempt to rely on PDI's corporate tax returns* in support of their argument that the lost profits award should be reduced.

Contrary to Plaintiffs' targeted calculation of Defendants' revenues, Defendants attempt to rely on PDI's corporate tax returns for the years 2016 and 2017, as well as the testimony of their (defamation) damages expert, Andrew Chambers. This is precisely the type of financial information which the cases cited by Defendants hold are irrelevant or insufficient for purposes of determining lost profits awards under the Lanham Act. Importantly, there is no indication that the jury ignored such evidence in reaching its lost profit award. In closing arguments, Defendants pointed to PDI's 2016 tax return and posited that since they

infringement occurred from July through December of that year, the lost profits would be "half" of the $23,757 net profit reflected on the tax return. Tr., R. 166 Page ID #3088-89. Defendants continued, claiming that because PDI's 2017 tax return showed a $32,000 net *loss*, and because the infringement occurred through September of that year, Plaintiffs' lost profit award should actually be a *negative amount*. *Id*. ("So guess what? They get to claim a loss -- our clients' business operated at a loss that year, so they get allocated $21,538. You combine those two numbers, the 11,000 and the 21,000 and they're still in the hole. The damages that they've sued for in this case, we contend, are for a negative amount of money").

Defendants' reliance on PDI's corporate tax returns falls far short of establishing the costs or deductions specifically attributable to sales of the Velocity Plus program for purposes of Lanham Act lost profits awards. The tax returns necessarily reflect *aggregate* costs borne by PDI as a business over the course of an entire year, not costs associated with the sale of the Velocity Plus program throughout a definite time frame. During the parties' oral motions for JMOL at trial, the district court aptly recognized that the reports relied upon by Plaintiffs "tell you the number of players including the number of return players versus the number of new players. So presumably based upon those numbers, you can determine the amount of lost profits from this program as opposed to, for instance, the tax returns which would give you everything including, I guess…batting cages.

19

So theoretically if I'm understanding this correctly…the tax returns that were turned over, they include. everything…. So the only way to determine lost profits would be using this report, the number of return players, the number of continuing players and to do the math from there." Tr., R. 161 Page ID #: 2792-93. Even more obvious is the fact that much of the information contained in the tax returns includes costs and expenses incurred by PDI during periods of time in which Defendants were *not* unfairly competing and infringing on Plaintiffs' marks.

As for the testimony of Defendants' expert witness, he similarly concluded that Defendants profit margin was 8.4% based upon PDI's tax returns for the years 2012 through 2016. Chambers Expert Report, R. 42-1 Page ID #323. For the same reasons explained above, this evidence is wholly irrelevant in determining net profits under the Lanham Act. Moreover, several of the tax returns used by Mr. Chambers were for years in which Defendants were not even using Plaintiffs' marks, authorized or unauthorized.

Nevertheless, Plaintiffs submit that the Court need not decide whether Defendants' sales of the Velocity Plus program were sufficiently attributable to their infringing use of Plaintiffs' marks on PDI's website. In *Max Rack, Inc.*, a case largely relied upon by Defendants, this Court reached a similar conclusion, explaining that the sale of any product "bearing the infringing mark" would have a sufficient connection between the infringement and the sale. *Max Rack,* 40 F.4th at

472 (citing *Wynn Oil Co. v. Am. Way Serv. Corp.*, 943 F.2d 595, 606 (6th Cir. 1991)). Here, each sale of the Velocity Plus program included a kit containing various weighted balls, each of which bore the NPA Trademark. Tr., R. 153 Page ID #1830; App. 31, PEX 47. Moreover, following the filing of Plaintiffs' motion for a preliminary injunction, the parties entered into stipulation that Defendants would cease all unauthorized use of Dr. House's name and the NPA Trademark, except for PDI's "liquidation or remaining ball kits in its possession having the Plaintiffs' name and/or trademark imprinted thereon." Agreed Order, R. 31 Page ID #172. However, Plaintiffs learned on the eve of the trial that the Newtons started a new company in 2018 called Throw Smart, LLC, which offered a program similar to the Velocity Plus program. Throw Smart's program *still included weighted ball kits bearing the NPA Trademark*. Tr., R. 155 Page ID #1986-88.] As such, given that each sale of the Velocity Plus program by Defendants contained products bearing the infringed upon NPA Trademark, the evidence is wholly sufficient to establish the requisite causal nexus among Defendants' infringement and revenues. *See Wynn Oil Co.*, 943 F.2d at 606 (citing *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 206-207 (1942)).

21

## B.    The District Court Did Not Abuse Its Discretion in Allowing Plaintiffs to Present Evidence of Damages

Defendants further argue that the jury's lost profits award should be reversed because Plaintiffs failed to disclose the damages being claimed prior to trial in accordance with Fed. R. Civ. P. 26(a). Def. Brief, pp. 35-41. Defendants requested JMOL in their favor on this issue, asking the district court to simply vacate the lost profits award. Alternatively, the asked for a new trial "following a full supplementation by Plaintiff of the required Rule 26(a)(1)(A) disclosure and limited, follow up discovery…." Def. JMOL motion, R. 170-1 Page ID #3207. On appeal, however, Defendants do not clearly state the relief now being sought. They simply argue that the district court's refusal to preclude the lost profits evidence "must be reversed." Def. Brief, p. 41. Yet Defendants do assert that this Court reviews the district court's application of Rule 26 for "abuse of discretion" and, as such, Plaintiffs submit, and assume, that Defendants seek only a new trial on this issue. *Id*. at p. 36.

This Court reviews evidentiary rulings under Rule 26 for abuse of discretion. *King v. Ford Motor Co.*, 209 F.3d 886, 900 (6th Cir. 2000). The district court's Post-verdict Memo & Order undertook a thorough analysis of Rule 26 and provided a well-reasoned application of the law to the facts of this case. R. 184 Page ID #3638-46. The ruling was well within the district court's discretion and need not be overturned.

22

"While the usual remedy for noncompliance with Rule 26(a) is exclusion of the late or undisclosed evidence, that sanction is not mandatory. A party may avoid sanctions if it can show that its failure to make a timely disclosure is 'substantially justified or is harmless.'" *HLV, LLC v. Van Buren City*, 775 F. Appx. 204, 214 (6th Cir. 2019) (citing Fed. R. Civ. P. 37(c)(1)) (internal quotations omitted). The court in *HLV* set forth the five-factor test adopted by the Sixth Circuit to determine whether an omitted or late disclosure is substantially justified or harmless under Rule 37(c)(1), which instructs courts to consider: (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the non-disclosing party's explanation for its failure to disclose the evidence. *HLV*, 775 F. Appx. at 214.

Applying the test set forth in *HLV*, the district court concluded that any failure by Plaintiffs to comply with the damages disclosure requirements of Rule 26 was both justified and harmless. Such a finding was well within the district court's discretion. First, Defendants were not surprised by Plaintiffs' claim for lost profits under the Lanham Act. Indeed, they were aware that Plaintiffs were seeking lost profits under the Lanham Act as soon as they were served with Plaintiffs' Verified Complaint. Complaint, R. 1 Page ID #9-10 ("NPA is entitled to a judgment against PDI for…PDI's profits"). Defendants admitted as such during

trial. Tr., R. 161 Page ID #2790. Plaintiffs clearly indicated in their motion for partial summary judgment in March 2018 that they were seeking Defendants' profits. Tr., R. 161 Page ID #2789. Tellingly, Defendants' own proposed jury instructions relating to Plaintiffs' Lanham Act claims included an instruction on lost profits. Proposed Instructions, R. 116 Page ID #1277.

The district court further noted that the lost profits damages requested by Plaintiffs could only be calculated from documents and other information *exclusively possessed by Defendants*. R. 184 Page ID #3640. Thus, Defendants could hardly be surprised by the documents and the simple calculation therefrom, let alone that Plaintiffs were seeking lost profits damages based on Defendants infringing sales of the Velocity Plus program.

Importantly, Plaintiffs had requested the documents and information from Defendants necessary to calculate their damages on multiple occasions throughout this litigation. *See, e.g.*, Post-Verdict Memo & Order, Page ID #3641 n.1 (noting that Plaintiffs propounded financial requests in their initial disclosures, including: "Accounting/financial records of PDI evidencing all revenues received by PDI through sales of the Velocity Plus program"). Yet Defendants perpetually failed to provide such documentation. Most significant, though, is that over three months before to the start of trial and well before the parties' pretrial compliance filings were due, Plaintiffs' counsel sent Defendants' counsel a letter dated July 27, 2021,

requesting that Defendants supplement their document production before trial with information showing PDI's monthly revenues and profits/losses, as well as Velocity Plus program reports showing the number of participants. 7/27/2021 Letter, R. 179-1 Page ID #3513-15.

The July 27, 2021 letter notified Defendants that the requested documents relating to PDI's sales of the Velocity Plus Program and its revenues therefrom "are relevant and necessary to the calculation of my clients' damages," and specifically stating that "**my clients' damages for their trademark infringement and related claims cannot be fully ascertained without information relating to PDI's monthly revenues through 2017.**" *Id*. Nevertheless, Defendants still failed to provide the necessary documentation.[3] The district court explained that as a result, "Plaintiffs calculated a damages figure at trial using the provided documents and basic math in the form of addition and multiplication." R. 184 Page ID #3641. Additionally, the district court opined that such "[b]asic math as a form of calculating damages should not reasonably have surprised Defendants." *Id*.

Defendants assert in their Brief, p. 37, that "the first time that Plaintiffs ever tried to introduce a number related to the allegedly infringing sales was during

---

[3] In fact, because Defendants never provided the requested financial records necessary to calculate their profits, Plaintiffs' damages evidence still represents an incomplete calculation of PDI's revenues earned from infringing sales of the Velocity Plus program.

Marie House's testimony," and further that they "*still* did not know that Plaintiffs were seeking 100% of Velocity Plus sales as a measure of lost profits" until "the very end of Plaintiffs' closing argument." This specious assertion is belied by the fact that the day before Marie House's testimony, Plaintiffs' counsel sent Defendants' counsel an email and spreadsheet attachment that "reflects our calculation of PDI's gross revenues generated from sales of the Velocity Plus Arm Care Program for the relevant periods in which we are claiming damages for trademark infringement against your clients." 11/21/2021 Email, R. 179-2 Page ID #3517-19 (also explaining that "these calculations are conservative" due to not having the complete documentation necessary); *see also* Memo & Order, R. 184 Page ID #3641 (district court acknowledging email).

Second, to the extent there was any surprise to Defendants, they had adequate opportunity to remedy it. The district court explained that the damages calculation clearly did not require expert testimony or similar analysis. *Id*. at Page ID #3642. Defendants attempt to emphasize that "profits *do not* equal revenues" and, as such "Plaintiffs' failure to provide a profit calculation in advance made it difficult—if not impossible—to cross-examine Marie House about how her *sales* calculations related to Plaintiffs' still-undisclosed *profit* claim." Def. Brief, p. 38-39. Aside from the fact that Plaintiffs did provide the basic mathematical calculation in advance using Defendants' own documents, this apparent

26

repackaging of their argument concerning the sufficiency of the evidence falls short of establishing a lack of opportunity to remedy any surprise. The district court noted that Defendants *did* present an expert witness who reviewed several of Defendants' financial records and even testified *after* Marie House. *Id*. Moreover, Defendants never requested a recess or additional time to review Plaintiffs' calculation, the relevant documents, or otherwise produce a counter-calculation. *Id*.

Perhaps most significant, though, is Defendants explanation (or lack thereof) for their failure to produce the necessary documents and financial records despite Plaintiffs' numerous requests. It is abundantly clear that any failure by Plaintiffs to supplement their disclosures by providing a computation of PDI's revenues/profits is not the result of their own neglect of Rule 26's requirements. Rather, Plaintiffs' inability to adduce a detailed computation of their damages under the Lanham Act is wholly a problem of Defendants' own creating. It was Defendants' own dilatory behavior and failure to comply with their own Rule 26 obligations that led directly to Plaintiffs' alleged untimely disclosure—a fact the Court recognized at trial. Tr., R. 166 Page ID #2976 ("The damages were in [Defendants'] possession -- the documents were in their possession to be able to figure out damages. I don't believe there was any good reason why those documents were not produced.").

27

## II.     The Punitive Damages and Fees Awards in Plaintiffs' Favor Are Not Fatally Flawed

### A.     Regardless of Whether the Punitive Damages Instruction Should Have Used "Clear and Convincing Evidence" Language, the Jury's Punitive Damages Award Should Not Be Overturned

Defendants argue that the jury verdict's award of punitive damages in favor of Plaintiffs was fatally tainted because the jury instructions omitted the "clear and convincing evidence" standard set forth in KRS 411.184(2). Def. Brief, p. 41-43. "A party is not entitled to a new trial based upon alleged deficiencies in the jury instructions unless the instructions, taken as a whole, are misleading or give an inadequate understanding of the law." *Wesley v. Campbell*, 864 F.3d 433, 441 (6th Cir. 2017). Further, where no prior objection to a jury instruction has been made, appellate review is only appropriate when an alleged error in the instruction is "obvious and prejudicial." *Young v. Langley*, 793 F.2d 792, 795 (6th Cir. 1986).

Defendants concede that they made no contemporaneous objection to the punitive damages instruction at trial. Def. Brief, p. 43. They fail to acknowledge, however, that they also failed to make any objection in their Post-verdict Motion. Despite the protracted arguments over the jury instructions during trial and the extensive briefing over Defendants' post-verdict requests for JMOL/a new trial, this appeal is the first time Defendants have raised this issue. In a misplaced attempt to convey that this is not their first time raising the issue, Defendants erroneously cite the Proposed Jury Instructions, claiming that they submitted a

28

proposed punitive damages instruction containing the "clear and convincing" language to the Court in advance of trial. *Id*. (citing R. 116 Page ID #1303). However, this was *Plaintiffs'* proposed punitive damages instruction—*not* Defendants. *See* Proposed Instructions, R. 116 Page ID #1281 (indicating beginning of Plaintiffs' proposed instructions relating to their own claims, including proposed punitive damages instruction on Page ID #1303); *see also id*. at Page ID #1218-1280 (Defendants' proposed instructions). This was Plaintiffs' only proposed instruction on punitive damages, as they believed only one such instruction was needed for each party. *See, e.g.*, *id*. at Page ID #1332. Defendants, on the other hand, proposed no less than 5 punitive damages instructions. *See, e.g.*, *id*. at Page ID #1230-31, 1238-39, 1244-46, 1253-55, 1279-80. *Notably, each of these punitive damages instructions proposed by Defendants exclusively employs the "preponderance of the evidence" standard" of which they now object. Id*. Thus, being raised for the very first time on appeal, Plaintiffs submit that the Court should not hear this argument. *Black*, 15 F.3d at 582.

In any event, Plaintiffs submit that the alleged error is not sufficiently "obvious and prejudicial" such that appellate review is warranted. First, the lack of the "clear and convincing" language was clearly not an *obvious* error, as Defendants appear not to have noticed same until this appeal. Nor is the alleged error prejudicial, for the same reasons discussed below.

Even if Defendants have not waived this issue and are correct that the "clear and convincing evidence" evidence language should have been used in the jury instruction, the verdict still should not be disturbed. This Court has explicitly held that a jury's punitive damages award rendered without the "clear and convincing evidence" language in the instruction should nevertheless be upheld when there is clear and convincing evidence in the record to support such an award. *See Anderson v. Wade*, 33 F. Appx 750, 759 (6th Cir. 2002) ("Although the district court erred in applying the common-law standard in determining punitive damages in this case, we nonetheless affirm the award because there was clear and convincing evidence in the record showing that Defendants' [conduct] warranted the imposition of punitive damages under KRS 411.184(2).").] Here, the evidence of record undeniably contains clear and convincing evidence that Defendants acted with the requisite "oppression, fraud, or malice" under KRS 411.184 to support the award of punitive damages.

Dr. House repeatedly asked Defendants to cease their unauthorized use of Plaintiffs' names and marks to promote their Velocity Plus program. Nevertheless, despite their knowledge of Plaintiffs' rights in their marks and having been plainly informed by Plaintiffs that they had no authorization to use Dr. House's name or the NPA Trademark, Defendants ignored these lawsuit demands and carried on with their brazen infringement, willfully conveying to consumers that Plaintiffs

30

were the source of the Velocity Plus program and falsely representing that an ongoing association existed between the parties. These lawful demands were continually disregarded by Defendants even after Plaintiffs initiated this lawsuit for trademark infringement and were only complied with after Plaintiffs moved for an injunction—nearly two (2) years after the first demand to dissociate NPA from the Velocity Plus program. Such reckless disregard for Plaintiffs' reputations, goodwill, and intellectual property rights is sufficient evidence for a jury to clearly and convincingly find Defendants' conduct reprehensible, especially in light of their disingenuous excuse that their refusal to comply with, albeit less than fully, Plaintiffs' demands was for the purpose of giving Dr. House "credit" for creating the methodologies on which the Velocity Plus program was based.

Further still, after Plaintiffs permitted Defendants to "liquidate" their remaining inventory of weighted ball kits bearing the NPA name and Trademark, Defendants had organized a new company, Throw Smart, and purportedly transferred the balls to this program without Plaintiffs' knowledge. Moreover, As shown in Exhibit B to Plaintiffs' Motion for Attorney Fees, Throw Smart was organized by the Newtons *the day before* the stipulation was entered into by the parties. Pl. Motion for Attorney Fees, R. 172-3 Page ID #3369-74. Approximately 3 years later, Plaintiffs learned of the Newton's Throw Smart program and discovered that they were still selling weight ball kits bearing the NPA name and

Trademark. At trial, the Newtons were evasive and dishonest about Throw Smart and their involvement in the company. Joe Newton testified that he didn't know anything about Throw Smart, LLC and that he wasn't involved in any such company. Yet the company's Articles of Organization and Annual Reports list Joe Newton as a member of the company. Tr., R. 153 Page ID #1780-81. Plaintiffs submit that such dishonest, deceitful, and fraudulent conduct, as well as the flagrant indifference towards to goodwill and property rights of Plaintiff, constitutes clear and convincing, if not conclusive, evidence sufficient to support the jury's award of punitive damages under KRS 411.184.

### B.    The Punitive Damages Award Is Not Constitutionally Excessive

Once again, the district court's Post-verdict Memo & Order undertakes a thorough analysis supported by a plethora of supporting law in denying Defendants' argument that the punitive damages award was constitutionally excessive. R. 184 Page ID #3659-64. As Defendants present no new basis on appeal for their contention that the award violated the Constitution, Plaintiffs reference and incorporate the district court's well-reasoned decision rejecting Defendants' argument and submit that such ruling should not be disturbed.

**III.  Defendants are Not Entitled to Judgment as a Matter of Law on Their Claim for Breach of Contract**

**A.  House Did Not Breach the License Agreement**

Once again, Defendants' argument that House was the first party to breach the License is not properly before the Court, as Defendants failed to preserve such argument for appellate review. The very first motion for JMOL pursuant to Rule 50(a) that Defendants made at trial concerned the parties competing breach of contract claims. Tr., R. 161 Page ID #2748-52. Plaintiffs opposed the oral motion, *id*. at Page ID #2752-57, and the Court denied same and allowed the claims to proceed to the jury Tr., R. 162 Page ID #2825-30.

This issue was not, however, one of the six arguments raised by Defendants in their renewed JMOL motion pursuant to Rule 50(b). *See* Def. JMOL Motion, R. 170-1 Page ID #3220-21. "In the context of a jury trial the Federal Rules of Civil Procedure tell parties to speak up at two times if they want the court to resolve the claim as a matter of law. They must move for judgment as a matter of law before the claim goes to the jury, *see* Fed. R. Civ. P. 59(a), and they must renew the motion (or seek a new trial) after the jury issues its verdict, *see* Fed R. Civ. P 59(b); Fed. R. Civ. P. 59." *Maxwell v. Dodd*, 662 F.3d 418, 420-21 (6th Cir. 2011). Accordingly, Defendants have not properly preserved this issue for appeal. *Unitherm Food Sys. v. Swift-Eckrich, Inc.*, 546 U.S. 394, 404 (2006) ("the precise subject matter of a party's Rule 50(a) motion—namely, its entitlement to judgment

33

as a matter of law—cannot be appealed unless that motion is renewed pursuant to Rule 50(b).") *Zachar v. Lee*, 363 F.3d 70, 73-74 (1st Cir. 2004) ("If the Rule 50(a) motion is denied and the case is submitted to a jury, the movant must renew the motion once again in order to preserve the issue for appeal.").

Even if Defendants properly preserved for appellate review the issue of whether House was the first in breach of the License Agreement, the argument still fails on its merits. JMOL is properly granted only if "when viewing the evidence in a light most favorable to the non-moving party, giving that party the benefit of all reasonable inferences, there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion in favor of the moving party." *Barnes v. City of Cincinnati*, 401 F.3d 729, 736 (6th Cir. 2005). A court should grant JMOL only "if a complete absence of proof exists on a material issue" or "if no disputed issue of fact exists on which reasonable minds could differ." *Karam v. Sagemark Consulting, Inc.*, 383 F.3d 421, 427 (6th Cir. 2004).

This Court review's a district court's denial of a motion for JMOL *de novo*. *Braun*, 828 F.3d at 509-10. In doing so, the Court "may not weigh the evidence, question the credibility of the witnesses, or substitute our own judgment for that of the jury." *Id*. (citing *Smith v. Rock-Term Servs., Inc.*, 813 F.3d 298, 306 (6th Cir. 2016)). For Defendants to succeed, they "must overcome the substantial deference owed a jury verdict." *Id*. (citing *Radvansky v. City of Olmsted Falls*, 496 F.3d 609,

34

614 (6th Cir. 2007)). Significantly, the Supreme Court has directed that "although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000).

The foregoing principles of review are significant here, as Defendants assert that there is "no question" that House breached Section 3(c) of the License Agreement, which provides, in relevant part, that "[House] shall promptly report to [PDI] known or suspected attempts by third parties to sell or market the PAJJT Program who do not have a contractual arrangement with the Licensee and shall further serve on such third parties that they are not authorized to sell or market the PAJTT Program." Agreement, R. 51-1, Page ID #512-518. However, Defendants merely attack the evidence suggesting that there were no third parties "known or suspected" of pirating the PAJTT Program upon which House was obligated to serve notice. They fail to identify any evidence which would support the necessary finding that there were, in fact, "known or suspected" third parties pirating the program. Instead, they simply make the conclusory assertion, without any citation to evidence of record, that "at least some of the third parties identified by the Newtons in 2014 and 2015 were reasonably suspected" or pirating the program. Def. Brief, p. 49.

The record is replete with testimony and other evidence from which, at the very least, reasonable minds could differ on the issue of whether House breached the License Agreement by failing to notify third parties "known or suspected" of implementing the PAJJT program without a contractual relationship with Defendant—indeed, the jury *did* find that there were no such "known or suspected" third parties and/or that House *did*, in fact, comply with his obligations under License Agreement. As such, the district court correctly submitted this disputed issue of fact to the jury.

At trial, there was scant evidence, if any, presented which arguably showed that any third parties could have been reasonably suspected of pirating the PAJTT Program, let alone any proof that a third party was, in fact, writing customized programs using the PAJTT Program's methodology and algorithms. First and foremost, House unequivocally testified that he never disclosed how to write customized programs using the PAJTT Program's algorithms to anyone other than Joe Newton and Jamie Evans. Tr., R. 155 Page ID #2075. Indeed, Defendants did not testify that they ever actually observed any third parties writing individualized training programs. *See, e.g.*, *id*. at Page ID #2026-27.

Second, Defendants presented zero testimony or other credible evidence of third parties implementing the PAJTT Program without authorization. For example, one of the so-called "pirates" identified by Defendants was Driveline

Baseball. House and Dean Doxakis, another NPA certified coach who testified at trial, explained that Driveline Baseball offered a baseball training program that implemented weighted balls. Through "genius market[ing]," the company engulfed much of the market for strength and training programs in the baseball industry. However, while Driveline used weighted balls, it's program was "not even close" to being the same thing as the PAJTT Program. Tr., R. 157 Page ID #2229-30 (House explaining that Driveline was "just training" and only focused on performance without regard to health); *id*. at Page ID #2183-84 (Doxakis explaining that Driveline "marketed just a velocity performance program without any regard to health or safety and they were absolute genius marketers and they took a lot of business"). Accordingly, House did not serve notice on Driveline Baseball that it was not authorized to implement the PAJTT Program "[b]ecause literally they were doing nothing close to our Velocity -- and that was on their list -- to our Personally Adaptive Joint Threshold Training…." Tr., R. 159 Page ID #2487.

Another alleged "pirate" identified by Defendants was Gardy O'Flynn, an NPA certified coach who testified at trial. When asked whether he'd ever seen any customized PAJTT programs written by Mr. O'Flynn, Joe Newton testified that he had not. Tr., R. 153 Page ID #1785-89. Joe's purported basis for identifying Mr. O'Flynn as a "pirate" was simply that Mr. O'Flynn's website for his baseball

37

academy advertised the Velocity Plus program. *Id*. Yet Mr. O'Flynn and PDI had

entered into a distributorship agreement which actually authorized, even obligated,

Mr. O'Flynn to advertise and market the Velocity Plus program on his website. *Id*.

In fact, Mr. O'Flynn even sent his players to PDI for the Velocity Plus Program,

and PDI earned revenues from such sales. *Id*.; Tr., R. 159 Page ID #2306.

Nevertheless, because the Newton's identified Mr. O'Flynn as a "known pirate,"

House singled him out during an NPA meeting and instructed him to stop writing

PAJTT programs.[4] Tr., R. 159 Page ID #2306-07.

     Nevertheless, Plaintiffs *did* take actions to investigate and/or prevent

potential unauthorized program writing because of the Newtons' identification of

so-called "pirates." House instructed numerous NPA coaches during meetings that

they "couldn't, shouldn't, or never even appear to be wiring programs." [Tr., R.

157 PageID: 2228-29. He reached out to Corey Ishigo, an NPA certified coach in

Hawaii. Mr. Ishigo informed House that he doing research on using weighted balls

in programs for preadolescents, but he was not writing programs (or even know

how to). Tr., R. 159 Page ID #2489-90; *see also id*. at Page ID #2483-84 (House

reaching out to individual named Gene Ross and learning "he had no clue what

spreads were"). Additionally, Marie House provided Joseph Newton with a form

---

[4] Mr. O'Flynn testified that this "caught me a little by surprise," and that when he
approached Joe Newton about the incident, Joe denied he ever identified Mr.
O'Flynn as pirating the program. *Id*.

cease and letter prepared by House's patent attorney which Defendant could send to third parties suspected or pirating the PAJTT Program. Tr., R. 161 Page ID #2632-33; App. 28, PEX 28. Notably, there was no evidence presented at trial indicating that Defendants sent the cease and desist letter to any third parties. Nor did Defendants ever institute legal proceedings against any third parties, which the License Agreement permitted them to do. Tr., R. 155 Page ID #2006.

As perhaps conveyed by the evidence discussed above, there was also testimony concerning the *training protocols* necessary to implement the PAJTT Program (*i.e.*, throws and holds using various weighted balls in different throwing positions) versus the writing of a *personalized program* for an athlete using the data collected through the training process in accordance with the PAJTT Program's algorithm. *See, e.g.*, Tr., R. 157 Page ID #2220-26 ("Q. If you don't do anything that's personally adaptive to the athlete, is that the [PAJTT] Program? A. It only becomes personally adaptive when you identify the velocity spreads for health and safety and the -- those spreads will help you identify where in the body or what the body needs to the training protocols to make that individual, his body, more efficient and safe throwing the ball.")

> [That knowledge] is the only thing that differentiated [Newton] and training -- there was probably a whole bunch of people that can train with, you know, one pound, two pound, all the way down to two ounce, doing the drills, but to actually measure and make it personally adaptive specific to the kid's age, the number of pitches he throws in a given week, where he is in the season, how much he's recovered. That's

where the [PAJTT] program specificity came in and that was the differentiating factor between us and everybody. Even Driveline doesn't do that."

Tr, R. 155 Page ID #2088-89.

The Newtons, on the other hand, appeared to believe that the License Agreement obligated House to prevent third parties from offering generic *training protocols*, regardless of whether a personalized program was generated using velocity spreads and the PAJTT Programs methodology. Tr., R. 155 Page ID #1925 (Joe testifying that "we were aggravated at that point that the joint integrity work was being given and we believe that's part of our program. We know that it's part of our program.") In essence, Defendants argued that House was obligated "police" each and every third party that might offer a program using weighted balls and generic training protocols. Neither common sense nor a plain reading of the Agreement support such a position. Defendants' bare assertions that third parties were marketing and implementing the PAJTT Program without authorization is not sufficient to obligate House to take action pursuant to Section 3(c), especially in light of the *utter lack of evidence* that any third parties were, in fact, implementing the PAJTT Program. In any event, the issue of whether House was obligated to "serve notice" on the third parties identified by Defendants is a matter on which reasonable minds could differ, and it was properly submitted to the jury.

40

As for Jamie Evans, the former part-owner of the NPA and only other individual to whom House disclosed the PAJTT Program-writing information, House testified that Evans was not following, and never did follow, the proper protocols or otherwise administer the PAJTT program as designed. House explained that Evans was "very Drive Line [sic] like where he was looking for instant bang, showing velocity increases as quickly as he possibly could, so it was arm speed before adaptation," which "is an injury waiting to happen." Tr., R. 155 Page ID #2093-94, 2108; *see also* Tr., R. 159 Page ID #2457 ("I had nothing to do with Jamie…. [F]or me to protect Joseph if something went wrong, he had to follow my protocol, not [Evans']."). This district court aptly recognized this testimony in denying Defendants' pre-verdict JMOL motion. Tr., R. 162 Page ID #2827-30. Notably, there was no evidence introduced that Evans was marketing and selling his program as the "PATT Program" or a program developed by Tom House. As Plaintiffs argued during pre-verdict JMOL motions, the issue of whether Jamie Evans was implementing the PAJTT Program was, at the very least, a disputed issue of fact for the jury to decide. Tr., R. 161 Page ID #2756.

Finally, and significantly, at no time before Defendants stopped paying royalties and providing reports to House under the License Agreement did they purport to inform House that their cessation of royalty payments was due to any alleged breach of the License Agreement by House, let alone a failure to police

41

piracy of the PAJTT Program. Tr., R. 153 Page ID #1734 (Joe testimony); Tr.. R.

155 Page ID #2004-05 (Joseph testimony); Tr., R. 155 Page ID #2110 (House

testimony). In fact, in February 2016, several months *after* Defendants stopped

paying royalties under the License Agreement, they *still* did not want to terminate

the License Agreement. Tr., R. 153 Page ID #1734 (Joe Newton explaining that the

Agreement was "going well" and Defendants "wanted to stay partners with Tom.

He was a good partner.").

Plaintiffs submit that this unrefuted evidence shows that even Defendants

did not consider House to be in breach of the Agreement for failing to contact or

prevent third parties "known or suspected" of pirating the program. Certainly, a

jury could reasonably infer from this evidence that Defendants failure to complain

or otherwise inform House of any alleged breaches prior to their own undisputed

breach indicates that Defendants were satisfied that House complied with his

obligations under the License Agreement. In sum, the district court properly denied

Defendants' pre-verdict JMOL motion on their claim for breach of contract. Tr., R.

162 Page ID #2829 ("So based on the various pieces of information in this case,

there is sufficient information to differ on a conclusion of whether Mr. House

breached Section 3(c), whether he should have gone after anyone or not, and those

are all factual issues that can go to the jury.").

**B.     Defendants' Waiver Argument is Irrelevant and was Not Preserved**

Defendants further argue that the jury should not have received an instruction on the issue of whether (if House did breach the License Agreement) Defendants waived such a breach. Def. Brief, p. 51. Of course, the jury never reached this instruction because it properly found that there was no such breach to waive. Nevertheless, for the same reasons that Defendants failed to preserve the argument that House breached the License Agreement first, however, Defendants have also waived this argument on appeal.

**IV.    The District Court Properly Refused to Give Instructions to the Jury Permitting House to be Personally Liable Under Defendants' Defamation Claims**

**A.     House Did Not Ratify Any Defamatory Statements**

Defendants' final argument on appeal is that the jury should have been permitted to hold House personally and jointly and severally liable with NPA under Defendants' defamation claims. Def. Brief, p. 52-57. Specifically, Defendants contend that the jury should have received an instruction on whether or not House "ratified" statements in the October 26, 2015 email to NPA coaches published by NPA's then-representatives, Alex Marney and Gary Adornato. "A district court's refusal to give a requested jury instruction constitutes reversible error if: (1) the omitted instructions are a correct statement of the law; (2) the instruction is not substantially covered by other delivered charges; (3) the failure to

43

give the instruction impairs the requesting party's theory of the case." *Hisrich v. Volvo Cars of North America, Inc.*, 226 F.3d 445, 449 (6th Cir. 2000).

First, Defendants' requested instruction on the issue of ratification did not rely on a correct statement of the law. The district court correctly explained that the case law cited by Defendants "does not support their theory that House may ratify his NPA associates' 'false or misleading statements'." Post-Verdict Memo. & Order, R. 184 Page ID #3653.

Defendants cite Kentucky cases setting forth the general elements necessary for ratification: (1) an after-the-fact awareness of the conduct; and (2) an intent to ratify it. *See, e.g.*, *Saint Joseph Healthcare, Inc. Thomas*, 487 S.W.3d 864, 875 (Ky. 2016). However, the case law relied upon by Defendants is completely inapposite. In *Saint Joseph Healthcare*, the issue before the Supreme Court was whether for willful or wanton negligence claims arising from a doctor-patient relationship, it was permissible under KRS 411.184(3) to allow a *punitive damages* instruction against *an employer* for the *gross negligence* of its *employee*, where the employer was already strictly liable under for the employee's gross negligence under a *vicarious liability/respondeat superior theory*. 487 S.W.3d at 873-75. In *Kindred Nursing Centers Ltd. P'ship v. Brown*, the issue before the Kentucky Court of Appeals dealt with whether a party's conduct could amount to ratification of a *contract*. 411 S.W.2d 242, 250 (Ky. App. 2011). Importantly, as the district

44

court recognized, these cases concern the ratification of *conduct*—not words. Post-verdict Memo & Order, R. 184 Page ID #3654.

The only case on which Defendants rely for their contention that Kentucky law supports ratification in cases involving claims of defamation is *Pennsylvania Iron Works Co. v. Henry Vogt Mach. Co.*, 96 S.W. 551 (Ky. 1906), a case in which a company manager wrote a libelous letter on company letterhead, causing the plaintiff to lose out on a contract. The trial court permitted an instruction to the jury on ratification by silence, and the jury found in favor of the plaintiff on its claim against the both the manager and company for libel *per se*. On appeal, the judgment was affirmed. *Id*. at 553-54. Even if this 100+ year old case can be relied upon as support for Defendants argument that a ratification instruction in defamation claims a proper reflection of Kentucky law, it still does not support such an instruction in this case.

Marney and Adornato were employees of NPA, not of Dr. House. In other words, NPA was the principal, and Marney and Adornato were its agents—they do not become agents of House simply by virtue of the fact that House was a shareholder of NPA.[5] Defendants do not—indeed, cannot—provide any legal

---

[5] Even if one were to assume that Defendants' proposed instruction is based on a correct statement of Kentucky law, the requested instruction could only be appropriate in this case if Defendants had sued *Adornato and/or Marney* for defamation. Even then, the ratification could only apply to *NPA*, of which they agents.

support for such a farfetched argument. In denying Defendants' JMOL Motion, the district court explained that not only does the record lack sufficient support to find that "Adornato and the boys" were House's agents, but Defendants did not cite any case law suggesting as such. Post-verdict Memo & Order, R. 184 Page ID #3656. On appeal, Defendants once again fail to cite authority that Adornato was House's personal agent and rely on irrelevant, out-of-context testimony from House that he was the owner of NPA (albeit only in a footnote). Plaintiffs submit that this Court should not reverse the district court's well-reasoned Post-Verdict Memo & Order finding that Defendants' requested ratification instruction was not based upon a correct statement of the law, especially under the facts of this case.

Moreover, the absence of the requested ratification instruction does not impair Defendants' theory of the case. Defendants speciously assert that the failure to give the instruction places the "principal culprit for their injuries" beyond the reach of their claims. Def. Brief, p. 55. The "principal culprit," of course, is Adornato. Defendants offer no reasoning for their contrived claim that an individual who did not publish, approve, or even become aware of the allegedly defamatory email is the principal culprit. Nevertheless, Defendants *did* get redress for their alleged injuries arising under their defamation claim, as the jury's verdict awarded compensatory damages to in the amount of $100,000.

Most important, however, is that Defendants clearly articulated their theory of case as follows:

> I mean, our theme of this case is that [House] and Adornato and Marney got together in the spring of 2015, said 'we need to find a way to get you out of this agreement.' The email was part of that scheme for him to try to get him out of this agreement…. It was done for him and he knew it was going to be done for him. I think that becomes authorized.
>
> …
>
> The entire conspiracy scheme -- squeeze-out, whatever you want to call it -- was to get him -- with his permission -- to get him out of this contract.

Tr., R. 162 Page ID #2923-24. In other words, Defendants' theory of the case was the House, Marney, and Adornato conspired together to get House out of the License Agreement, and House had knowledge and approved of the defamatory email *before* its publication. Certainly, Defendants' requested instruction asking the jury to determine whether House ratified the email through his *after-the-fact* awareness of same does not impair their theory that the email was part of a premeditated scheme by House to terminate the License Agreement.

### B.    House Cannot Be Liable to Slander *Per Se*

Defendants' further argue that the district court should have given an instruction to the jury allowing them to find House personally liable for defamation *per se*. Def. Brief, p. 55-57. Defendants rely solely upon the testimony of Bill

Schopp, whose video deposition was taken on November 20, 2020, and played at trial before the jury.[6]

First, for the same reasons set forth above with respect to Defendants' request for JMOL that House was the first in breach of the License Agreement, they have failed to preserve this issue for appellate review. While Defendants objected during trial to the district court's refusal to include an instruction against House for slander *per se*, they did not raise or otherwise argue this issue in the Post-verdict Motion for JMOL or a new trial.

Even if Defendants did not waive this argument on appeal, it nevertheless fails on its merits. Schopp's testimony upon which Defendants rely is that on October 10, 2015, during a clinic in Miami, Florida, House verbally "mentioned to me that [Defendants' Velocity Plus program] was hurting a lot of arms." R. 169-1 Page ID #3153. House denied making this statement or otherwise intimating to Schopp or any other person that Defendants' were causing injuries, Tr., R. 157 Page ID #2242. and this was the only evidence presented throughout trial to the effect that House made any such statement, verbal or in writing.

---

[6] Subsequent to the jury's verdict, Defendants moved to district court to supplement the record to include the transcript of Bill's Schopp's trial deposition testimony. Def. Motion to Supp. Official Transcript, R. 169 Page ID #3142. The Court granted the motion, attached to which was the transcript of Schopp's deposition containing the portions played before the jury highlighted in yellow. *Id*. at Page ID #3144-3191.

According to Defendants, because the verbal statement allegedly made by House imputes "unfitness to perform duties of office," the evidence supports a claim for slander *per se* against House and an instruction should have thus gone to the jury "without [the need for] allegation or proof of special damages." Def. Brief, p. 55-57 (citing *Disabled American Veterans v. Crabb*, 182 S.W.3d 541, 547 (Ky. App. 2005)). Defendants emphasize the latter part of this argument because *the evidence* <u>*indisputably*</u> *showed, and Defendants all but conceded, that **they suffered no injury—economic, reputational, or otherwise—as a result of the alleged statement**. Schopp testified that he *did not believe* any alleged statements that Defendants were causing injuries. *Id*. at Page ID #3153-57. Significantly, Schopp *never* ceased sending players through Defendants' Velocity Plus program. Even as of the date of his trial deposition, he *still* did business with the Newtons. *Id*. at Page ID #3164-65.

As the district court recognized during trial, Defendants' requested instruction certainly would not conform to the evidence: "I don't see based on that statement that there was any harm done by it because that individual who was the individual who heard the statement indicated that they continued to do business with him" and it "is not something that there's evidence that it did anything to their reputation 'cause the individual who heard it and testified to it said that they had a great relationship." Tr., R 162 Page ID #2923-25.

The district court correctly determined that the requested instruction was not supported by the evidence and that no reasonable jury could come to the conclusion that the Defendants suffered any compensable injury as a result of the alleged statement.[7] The refusal to give the instruction was not a mistake of law, and reversal is not warranted. *Hisrich*, 226 F.3d at 449.

## CONCLUSION

For the reasons set forth herein, the district court properly instructed the jury on all issues, properly denied Defendants' JMOL motions, and did not abuse its discretion in any respect. Plaintiffs respectfully request that this Court reject each of the arguments asserted by Defendants on appeal.

Date: February 3, 2023                               Respectfully submitted,

/s/ Michael A. Valenti
Michael A. Valenti

*Attorney for Plaintiffs, Dr. Thomas House and National Pitching Association, Inc.*

---

[7] Plaintiffs also note that during arguments over the jury instructions, Defendants did not clearly object to the defamation instructions on the grounds that they wanted a *separate* instruction against House for slander *per se*. Rather, Defendants wanted to use Schopp's testimony to lump House in with NPA on a general defamation instruction. Tr., R. 162 Page ID #2907-25. Of course, this would not have been proper, House's alleged statement to Schopp was entirely separate and distinct from the October 26, 2015 email from Adornato. Nor would it comport with their repeated requests for a ratification instruction against House.

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing document complies with Fed. R. App. P. 32(a)(5) and 32(a)(7)(B) because it was prepared using Times New Roman 14-point type and contains 12,450 words.

/s/ Michael A. Valenti
Michael A. Valenti

## CERTIFICATE OF SERIVCE

I hereby certify that on February 3, 2023, I filed of copy of the foregoing brief and served it on all parties by filing it through the Court's CM/ECF System/ counsel for all parties are registered ECF users.

/s/ Michael A. Valenti
Michael A. Valenti

# ADDENDUM

The following are hereby designated as relevant documents from the trial court record:

| Record No. | Description | Page ID # |
|---|---|---|
| 1 | Verified Complaint | 1 - 14 |
| 5-1 | 10/13/2015 Adornato Letter | 72 -74 |
| 31 | Agreed Order re: Motion for Preliminary Injunction | 172 - 174 |
| 37-4 | 6/29/2016 Termination Letter | 214 - 218 |
| 42-1 | Drew Chambers Expert Report | 321 - 343 |
| 51-1 | License Agreement | 512 - 518 |
| 51-10 | 10/26/2015 NPA Email | 597 - 598 |
| 116 | Proposed Jury Instructions | 1200 - 1328 |
| 151 | Transcript of Jury Trial, Vol. 1 | 1612 - 1705 |
| 153 | Transcript of Jury Trial, Vol. 2 | 1709 - 1915 |
| 155 | Transcript of Jury Trial, Vol. 3 | 1919 - 2126 |
| 157 | Transcript of Jury Trial, Vol. 4 | 2130 - 2293 |
| 159 | Transcript of Jury Trial, Vol. 5 | 2297 - 2534 |
| 161 | Transcript of Jury Trial, Vol. 6 | 2538 - 2822 |
| 162 | Transcript of Jury Trial, Vol. 7 | 2823 - 2953 |
| 166 | Transcript of Jury Trial, Vol. 8 | 2967 - 3136 |
| 169-1 | Bill Schopp Deposition Transcript | 3144 - 3191 |
| 170-1 | Defendants' JMOL Motion | 3196 - 3222 |
| 172-1 | Plaintiffs' Motion for Attorney Fees | 3321 - 3335 |
| 172-3 | Throw Smart, LLC Sec. of State Filings | 3368 - 3374 |
| 179 | Plaintiffs' Response to Def. JMOL Motion | 3483 - 3511 |
| 179-1 | 7/27/2021 Damages Discovery Letter | 3512 - 3515 |
| 179-2 | 11/21/2021 Email re: Lost Profits Calculation | 3516 - 3519 |
| 184 | Opinion & Order Denying Def. JMOL Motion | 3635 - 3678 |