No. 22-5843

UNITED STATES COURT OF APPEALS FOR THE SIXTH CIRCUIT

_____

THOMAS HOUSE, ET AL.,

*Plaintiffs-Appellees*

v.

PLAYERS' DUGOUT, INC., ET AL.

*Defendants-Appellants*

_____

On Appeal from the United States District Court
for the Western District of Kentucky
Case No. 3:16-cv-00594

_____

**REPLY BRIEF OF APPELLANTS**

_____

Michael P. Abate
Burt A. (Chuck) Stinson
KAPLAN JOHNSON ABATE & BIRD LLP
710 West Main Street, Suite 400
Louisville, KY 40202
Telephone: (502) 416-1630
mabate@kaplanjohnsonlaw.com
cstinson@kaplanjohnsonlaw.com

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................I

TABLE OF AUTHORITIES ........................................................ II

INTRODUCTION ...................................................................... 1

I.   The District Court Abused Its Discretion by Denying Defendants'
     Request for a New Trial on Lanham Act Damages. ................................ 1

     A.   Defendants Have Not Forfeited Their Lanham Act Damages
          Argument....................................................................... 2

     B.   Plaintiffs Failed to Show that All Velocity Plus Sales Are
          Attributable to the Infringement........................................... 5

     C.   Plaintiffs Declined to Respond to Defendants' Argument that the
          District Court Had a Duty to Curb the Excessive Damage Award. ... 9

     D.   Plaintiffs' Improper Surprise Testimony Was Unjustified
          and Harmful.................................................................. 11

II.  This Court Should Vacate the Punitive Damages Award. ..................... 16

     A.   The Punitive Damages Instruction Omitted the Required "Clear and
          Convincing Evidence" Standard. ..................................... 16

     B.   Plaintiffs Decline to Respond to the Argument that the Punitive
          Damages Award Is Constitutionally Excessive.............................. 19

III. House Breached the Contract First. ..................................... 20

IV.  The Court Should Have Instructed the Jury to Consider Whether House
     Was Personally Liable for Defamation................................... 25

     A.   House Ratified Adornato and Marney's Defamatory Statements. ... 25

     B.   House Is Liable for Slander *Per Se.* .................................. 27

Conclusion............................................................................. 29

Certificate of Compliance

Certificate of Service

Addendum

## TABLE OF AUTHORITIES

### Cases

*Anderson v. Wade*,
    33 F. App'x 750 (6th Cir. 2002)..........................................................17, 18

*Breaking the Chain Found, Inc. v. Capitol Educ. Support, Inc.*,
    625 F. Supp. 2d 1 (D.D.C. 2009)............................................... 10

*Cernelle v. Graminex, LLC*,
    2022 WL 2759867 (6th Cir. July 14, 2022) ................................ 5

*Clem v. Lomeli*,
    566 F.3d 1177 (9th Cir. 2009)................................................... 11

*Davis v. O'Connor*,
    812 F. App'x 659 (9th Cir. 2020) ............................................. 20

*Dickinson v. Cosby*,
    250 Cal. Rptr. 3d 350 (2019) .................................................... 27

*Disabled American Veterans v. Crabb*,
    182 S.W.3d 541 (Ky. Ct. App. 2005).......................................... 28

*Eifler v. Greenamyer*,
    2019 WL 2712618 (Ky. Ct. App. June 28, 2019) .................................16, 18

*EQT Prod. Co. v. Phillips*,
    767 F. App'x 626 (6th Cir. 2019).........................................................11, 13

*Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Ohio*,
    849 F.2d 1012 (6th Cir. 1988)................................................. 5, 8

*Gregory v. City of Louisville*,
    444 F.3d 725 (6th Cir. 2006) .................................................... 18

*Harrod Concrete & Stone Co. v. Melton*,
    2007 WL 3121282 (Ky. Ct. App. Oct. 26, 2007) ....................................... 17

*Haynes v. McCalla Raymer, LLC*,
    793 F.3d 1246 (11th Cir. 2015)................................................. 20

*Howe v. City of Akron*,
    801 F.3d 718 (6th Cir. 2015) .................................................... 12

*Johnson v. United States*,
    520 U.S. 461 (1997) ................................................................. 20

*Lebron v. National Railroad Passenger Corp.*,
   513 U.S. 374 (1995) ................................................................. 3

*Licciardi V. TIG Insurance Group*,
   140 F.3d 357 (1st Cir. 1998) .................................................. 13

*Max Rack, Inc. v. Core Health & Fitness, LLC*,
   40 F.4th 454 (6th Cir. 2022) .................................................. 8

*Moore v. Equitrans, L.P.*,
   27 F.4th 211 (4th Cir. 2022) ................................................. 14

*Nash-Finch Co. v. Casey's Foods, Inc.*,
   762 F. App'x 218 (6th Cir. 2018) .......................................... 22

*Osborne v. Keeney*,
   399 S.W.3d 1 (Ky. 2012) ...................................................... 16

*Pannell v. Shannon*,
   425 S.W.3d 58, 83 (Ky. 2014) .............................................. 26

*Pennsylvania Iron Works Co. v. Henry Vogt Mach. Co.*,
   96 S.W. 551 (Ky. 1906) ......................................................... 27

*Stryker Employment Co., LLC v. Abbas*,
   — F.4th —, No. 22-1563, 2023 WL 2028701 (6th Cir. Feb. 16, 2023) ......... 5

*Taylor v. Thomas*,
   624 F. App'x 322 (6th Cir. 2015) .......................................... 10

*The Ohio Adjutant General's Dep't v. Fed. Labor Relations Auth.*,
   21 F.4th 401 (6th Cir. 2021) .................................................. 3

*United States  v. Moreno*,
   899 F.2d 465 (6th Cir. 1990) ................................................. 28

*United States v. Barrow*,
   118 F.3d 482 (6th Cir. 1997) ................................................. 17

*United States v. Miller*,
   115 F.3d 361 (6th Cir. 1997) ................................................. 15

*United States v. Montgomery*,
   998 F.3d 693 (6th Cir. 2021) ................................................. 3

*United States v. Olano*,
   507 U.S. 725 (1993) .............................................................. 22

*United States v. Owusu*,
    199 F.3d 329 (6th Cir. 2000) ................................................................... 18

*United States v. Ramamoorthy*,
    949 F.3d 955 (6th Cir. 2020) ................................................................... 18

*Wieland v. Freeman*,
    2022 WL 816964 (Ky. Ct. App. Mar. 18, 2022) ........................................ 29

## Statutes

15 U.S.C. § 1117(a) ..................................................................................... 9

KRS § 411.184 ........................................................................................... 17

## Other Authorities

9C Charles Alan Wright & Arthur R. Miller,
    *Federal Practice and Procedure* §2258 (3d ed. 2022) ............................... 28

Restatement (Third) Of Agency ............................................................26, 27

## Rules

Fed. R. Civ. P. 26(a) ................................................................................... 12

Fed. R. Civ. P. 37(c) ................................................................................... 11

**INTRODUCTION**

Plaintiffs Thomas House and the National Pitching Association ("NPA") breached their contract with Players' Dugout, Inc. ("PDI"), and drove it out of business by their tortious conduct, depriving Joe Newton and his son Joseph of their livelihoods. And yet, the jury awarded the *Plaintiffs* hundreds of thousands of dollars in damages. Unable to defend that manifestly unjust result on the merits, Plaintiffs ask this Court to preserve it based on technicalities. Their arguments mischaracterize both the law and the record and should be rejected.

## I.    The District Court Abused Its Discretion by Denying Defendants' Request for a New Trial on Lanham Act Damages.

Defendants have given three reasons this Court should vacate the award of profits for Plaintiffs' Lanham Act claims: (1) there is no evidence showing that the monies they recovered are attributable to the infringement of Plaintiffs' trademarks; (2) the trial court neglected its statutory duty to reduce the plainly excessive award, and (3) that inflated sum resulted from improper surprise testimony.

To the extent Plaintiffs address the merits of those arguments at all, their answers are unpersuasive. To the first point, Plaintiffs rely solely on evidence that either directly contradicts their argument or was excluded by the district court. To the second, they offer no response. And as for the third, Plaintiffs

leave unanswered Defendants' core argument that the inflated damages calculation, which they sprang on Defendants late in the trial, had lain in Plaintiffs' possession undisclosed for months.

## A.  Defendants Have Not Forfeited Their Lanham Act Damages Argument.

Plaintiffs first try to distract this Court by arguing that Defendants' precise framing of the Lanham Act damages issue on appeal is not an exact clone of its district court argument and therefore is forfeited. But that's not how issue preservation works.

Defendants argued in their midtrial Rule 50(a) motion, as well as their posttrial 50(b) motion, that the jury's award of profits under the Lanham Act far exceeded what the evidence in the record could support. Plaintiffs concede as much in their brief. Appellants' Br. at 11–12. But, they contend, the focus of that argument was on the jury's failure to "consider evidence of *costs and expenses*" to offset Plaintiffs' claim of top-line revenues, not on the dearth of evidence tying those revenues to the infringement. *Id.* at 12 (emphasis original). So even though they concede that Defendants timely argued that the jury failed to award an accurate amount of profits attributable to the infringement, they say that argument focused only on the amount, not the attributability.

That argument fails for two reasons.

First, even if Plaintiffs had fairly characterized what happened in district court—which they have not, as explained below—Defendants did more than enough to preserve their challenge to the Lanham Act disgorgement award. To preserve an argument for appeal, a party need only "make a timely assertion" of the right at issue in the district court proceeding. *United States v. Montgomery*, 998 F.3d 693, 698 (6th Cir. 2021). So long as the relevant claim has been preserved—here, that the Lanham Act damages award was excessive—"a party can make any argument in support of that claim; parties are not limited to the precise arguments they made below." *Lebron v. National Railroad Passenger Corp.*, 513 U.S. 374, 379 (1995) (citation omitted). Indeed, "[i]t would be unreasonable, and in some ways would defeat the purposes of appellate litigation, to require [the appellants] to raise the exact same arguments that they raised earlier." *The Ohio Adjutant General's Dep't v. Fed. Labor Relations Auth.*, 21 F.4th 401, 406 (6th Cir. 2021) (permitting five arguments on appeal not articulated "verbatim" in the administrative proceeding under review).

In any event, Defendants did in fact make the attributability argument several times in the district court. The first was in its directed-verdict motion, argued the same day as Marie House's surprise testimony. There, Defendants' trial counsel argued that there was no indication that the revenues in Ms.

House's testimony came from the unauthorized use of the NPA's logo on the
Players' Dugout website:

> [T]hey might have [used] expert testimony. That's how you put on
> lost profits evidence relating to a trademark claim. It's an intricate
> calculation. You know, the fact that that squiggle's on the website,
> how much traffic is it driving to the website? *How much of the*
> *business is attributable to use of the trademark?*

Tr., R. 161, PageID #2786.[1] The subject also came up in Defendants' closing
argument: "[E]ven if [House] had some protected right in that picture, who
knows who got there. *There was no testimony that anyone saw this website and was*
*confused about it,*" nor that "the little squiggly mark . . . confused anyone." R.
166, PageID #3088. Again, during the debate over jury instructions,
Defendants' counsel argued that Plaintiffs were not generically entitled to
receive "profits derived from the sale of the [Velocity Plus] program," but
rather only "profits *attributable to the infringement* of the marks." *Id.*, PageID
#2995. And finally, in their JNOV motion, Defendants argued as follows:

> Even when a plaintiff is entitled to a profits award, they should
> rightly recover *only net profits attributable to an alleged infringement.*
> Here, all the jury had from the Plaintiffs was Ms. House's surprise,
> superficial, incomprehensible, unexplained testimony claiming
> over $300,000 in gross profits.

---

[1] Trial counsel frequently referred to the trademarked silhouette of a pitcher in
the NPA's logo as a "squiggle."

JNOV Motion, R. 170-1, PageID #3207. They further explained, "The purpose of awarding Defendants' profits is to disgorge the defendant of actual net profits *attributable to infringement*." Reply in Support of JNOV Motion, R. 181, PageID #3564.

This is more than enough to preserve Defendants' Lanham Act damages argument. *See Stryker Employment Co., LLC v. Abbas*, — F.4th —, No. 22-1563, 2023 WL 2028701, at *7 (6th Cir. Feb. 16, 2023) (all that's required is "some minimal level of argumentation" in the trial court to preserve an issue for appellate review). Plaintiffs' attempt to insulate its unsupportable lost profits award from this Court's review must be rejected.

## B. Plaintiffs Failed to Show that All Velocity Plus Sales Are Attributable to the Infringement.

The Lanham Act only permits Plaintiffs to recover profits attributable to infringing use of a mark. *See Cernelle v. Graminex, LLC*, 2022 WL 2759867, at *5 (6th Cir. July 14, 2022) (citing *Frisch's Restaurants, Inc. v. Elby's Big Boy of Steubenville, Ohio*, 849 F.2d 1012, 1016 (6th Cir. 1988)). But Plaintiffs made no effort at trial to show how much of the Velocity Plus revenues, if any, were derived from sales of the program through Players' Dugout's website. That was a fatal omission, because they can only recover profits attributable to sales through the infringing website and not from other sources, such as word-of-mouth referrals or in-person events.

Plaintiffs attempt to make a post-hoc showing that 100% of Velocity Plus revenues were derived from the infringing website, quoting the testimony of two witnesses: Joe Newton and Andrew Chambers (Defendants' defamation damages expert). But both witnesses' testimonies undermine Plaintiffs' argument.

Joe said nothing about how much revenue Players' Dugout got from online sales of the program during the infringement period; he wasn't even asked. Instead, under cross-examination, Joe was merely asked whether he thought Dr. House's association with Velocity Plus was a valuable resource. He responded, "I'm sure it was to some people. People didn't go to the website to see [House's name] at the top of our page. They went to the website to see Stevie Delabar. That's what it was intended to do, but we gave credit to Dr. House." Appellees' Br. at 15 (quoting R. 153, PageID #1727–28). According to Plaintiffs, that testimony "belies the assertion that PDI's customers or potential customers did not visit its website in connection with the Velocity Plus program." *Id.* But Defendants never made that "assertion." Rather, Defendants acknowledge that at least some Velocity Plus sales could have come through the website. They simply argue that Plaintiffs failed in their burden to make any showing of what that percentage was; they cannot cure

that default on appeal by asking the Court to assume that 100% of Velocity Plus sales were the result of website infringement.

Chambers' testimony was similar. Asked on cross-examination whether players who wanted a personalized training program came to Players' Dugout "through the website," Chambers answered, "That was one of the—yeah. That was *a way* they came to the program, for sure." Appellees' Br. at 16 (quoting Tr., R. 161, PageID #2723) (emphasis added). Thus, the sole expert to testify at trial was careful to specify that the infringing website was only "one of the" various ways customers purchased Velocity Plus training programs. That doesn't support Plaintiffs' insistence that 100% of sales came through the website.

In fact, the very royalty reports that Plaintiffs used to calculate their damages undercut the argument they now make on appeal. Those reports break down the royalties *by referral source. See, e.g.,* App. 140–41 (Royalty Report). Only about a third of the revenues came from PDI itself (including through its website); the large majority came from other distributors.

Attempting to distract from their failure to prove sales attributable to the infringement, Plaintiffs assert that every sale by PDI must have been because of its association with Dr. House:

> [D]espite numerous demands from Plaintiffs to cease the unauthorized use of their names and marks, Defendants continued

to use Plaintiffs' marks on its website until September 2017 . . . . show[ing] that *even they believed* the conveyance of an association with Dr. House and the NPA was the primary means to generate sales of the Velocity Plus program.

Appellees' Br. at 16 (emphasis original). Putting aside that PDI had significant sales before it ever partnered with Dr. House, crediting this precariously tottering heap of inferences would transform the Lanham Act into a strict-liability regime that results in automatic disgorgement of all profits earned by a defendant during a period of infringement. That is not the law, however. *See Max Rack, Inc. v. Core Health & Fitness, LLC*, 40 F.4th 454, 472 (6th Cir. 2022) (Lanham Act plaintiff "must show some connection between the identified 'sales' and the alleged infringement"); *Frisch's Restaurants*, 849 F.2d at 1016 (disgorgement unavailable where plaintiff "did not establish a link" between the defendant's sales and the infringing conduct).

Finally, Plaintiffs' attempts to show instances of non-website-based infringement fall flat. The only trademark claims litigated in this case relate to uses of Dr. House's name and the NPA's logo on Players' Dugout's website— nothing else. *See* Amended Complaint, R. 39, PageID #240, 242, 244–45; Jury Instructions, R. 141, PageID #1453, 1464. Moreover, Joe's appearance with Dr. House *and Delabar* (the main draw) at the 2014 ABCA conference in Orlando and his use of the NPA network to promote Velocity Plus cannot

8

constitute infringement; those acts occurred before Plaintiffs withdrew their consent to Defendants' use of the marks.

Likewise, Defendants' use of weighted ball kits stamped with the NPA logo cannot be actionable infringement. That separate allegation of infringement was never pleaded, was never argued to the jury, and was not included in any draft of the jury instructions. This was no accident; the parties expressly agreed that Defendants could sell the remaining ball kits without incurring additional liability. Proposed Agreed Order, R. 31. So, when Plaintiffs' counsel attempted to question Joseph about the sale of ball kits bearing the NPA logo, Defendants objected to the line of questioning, Tr., R. 155, PageID #1979–96. The court sustained the objection and instructed the jury not to consider the objected-to evidence (e.g., the ball kits) as evidence of infringement. Mem. Op., R. 184, PageID #3650 (citing Tr., R. 155, PageID #1979–96). Plaintiffs chose not to cross-appeal and cannot be permitted to smuggle in these allegations of allegedly infringing sales through the back door.

### C. Plaintiffs Declined to Respond to Defendants' Argument that the District Court Had a Duty to Curb the Excessive Damage Award.

The Lanham Act requires a district court, sitting in equity, to adjust a recovery of profits it deems to be "excessive." 15 U.S.C. § 1117(a). And although the plaintiff bears the burden of demonstrating revenues from the infringement only, "that does not mean that the Court may ignore evidence in

the record before it as to defendant's cost and deductions." *Breaking the Chain Found, Inc. v. Capitol Educ. Support, Inc.*, 625 F. Supp. 2d 1, 3 (D.D.C. 2009).

Here, that evidence includes expert testimony that Players' Dugout's average annual profits from 2012 to 2016 were only 8.4% of its total revenue, not 100%. Tr., R. 161, PageID #2689–90. It also includes income tax statements showing that the company's total profits during the infringement period were a fraction of what the jury awarded the Plaintiffs. App. 38–136. Indeed, in 2017, the company operated at a loss of $32,307. App. 97.

In response, Plaintiffs say those figures are irrelevant. What matters, they argue, is how much profit the Velocity Plus program earned, not Players' Dugout as a whole. But that begs a simple question: how could it be that Velocity Plus, which accounted for virtually all of Players' Dugout's business, Tr. R. 153, PageID #1836, earned $340,000 of pure profit, even as the company as a whole lost money? It couldn't.

The district court's decision not to consider "evidence in the record before it as to defendant's cost and deductions," *Breaking the Chain Found, Inc.*, 625 F. Supp. 2d at 3, was error. A better course would have been for the court to limit the recovery to "an award of royalties normally received" for use of the mark, as that is "often a proper measure of damages." *Taylor v. Thomas*, 624 F. App'x 322, 328 (6th Cir. 2015).

Plaintiffs did not respond to Defendants' argument that the district court had a duty to curb the jury's excessive lost profits award. They can no longer contest that the Court had an obligation to do so. *See Clem v. Lomeli,* 566 F.3d 1177, 1182 (9th Cir. 2009) (when an appellee fails to raise an argument in an answering brief "[h]e has therefore waived the argument").

### D.    Plaintiffs' Improper Surprise Testimony Was Unjustified and Harmful.

There's no dispute that Plaintiffs fell short of Rule 26's requirement to make a timely disclosure of their "computation of each category of damages claimed." After all, they didn't share their calculation of Velocity Plus revenues until the night before the sixth day of trial. And the first time Plaintiffs disclosed their intention to claim 100% of those revenues as Lanham Act damages was during their closing argument. Rule 37(c) mandates that the evidence of Lanham Act damages be excluded unless they can prove that the failure was "substantially justified or harmless." Fed. R. Civ. P. 37(c); *EQT Prod. Co. v. Phillips*, 767 F. App'x 626, 634 (6th Cir. 2019) (holding that "the potentially sanctioned party . . . bears the burden of proving harmlessness or substantial justification").

This Court considers five factors to determine whether failure to disclose is unjustified:

11

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

*Howe v. City of Akron*, 801 F.3d 718, 748 (6th Cir. 2015). All five factors favor exclusion of Plaintiffs' undisclosed damages computation.

*Surprise to Defendants.* Plaintiffs assert that the late disclosure wasn't a surprise because the royalty reports, which served as the basis for Marie House's revenue calculation, came from Defendants. That misses the point. Rule 26 requires an up-front "computation of each category of *damages claimed*." Fed. R. Civ. P. 26(a). The Lanham Act only permits recovery of net profits *attributable to the infringement*. Given that sales through the infringing website were just one among several sources of Velocity Plus revenue, Tr., R. 161, PageID #2763, Defendants had no reason to suspect until closing argument that Plaintiffs' "computation of . . . damages claimed" would include all Velocity Plus sales.[2]

*Ability to cure and disruption of the trial.* According to Plaintiffs, Defendants had an opportunity to cure the surprise because (1) their own damages expert

---

[2] This is not a "specious assertion," as Plaintiffs claim. It is true that Plaintiffs disclosed their total-revenue calculation in an email the night before the close of their evidence, but Defendants could not have known before closing that they would claim—contrary to what the royalty reports show, *see* Pl. Ex. 58— that all of those revenues were attributable to the infringement.

testified after Ms. House, and (2) they could have requested a recess. Both arguments fail.

Defendants' expert was retained to testify about damages arising from their defamation claims, not to rebut Plaintiffs' undisclosed revenue computation. So even though his testimony regarding PDI's profit margin during the infringement period directly undercut the jury's award of total revenues, he had no opportunity to determine what share of Velocity Plus sales were derived from the infringing website versus other non-infringing income streams. That lack of opportunity is particularly salient given that his testimony was scheduled the same day as Ms. House's, and that he was unavailable to testify anytime thereafter. Tr., R. 161, PageID #2548.

Plaintiffs' suggestion that Defendants could have asked for a recess to cure any prejudice is equally unavailing. That is not how Rule 37 works. *See EQT*, 768 F. App'x at 469 (noting that it would be unfair to require "the non-defaulting party, to bear the effort and expense necessary to cure EQT's failure to disclose"); *Licciardi V. TIG Insurance Group*, 140 F.3d 357, 366 (1st Cir. 1998) ("[A] continuance is not effective in every circumstance to counteract the unfair surprise."). Plaintiffs' suggestion is also inconsistent their own conduct at trial. When Defendants' damages expert attempted to update calculations to his three-year-old report, Plaintiffs objected that the harm of permitting a

13

previously deposed witness to introduce new damages testimony cannot be cured on the fly. *See* Tr., R. 161, PageID #2702. The district court sustained the objection and excluded the new damages evidence. *Id.*, PageID # 2716.

What's good for the goose is good for the gander. Having successfully opposed that new testimony on the grounds that they could not cure the surprise without re-deposing the witness, it is disingenuous for Plaintiffs to argue that Defendants could have cured Ms. House's surprise testimony by requesting a brief recess. What's worse, the evidence to which Plaintiffs objected was merely an update to existing computations to account for the passage of time, "based on updated information that [Plaintiffs'] had in their possession." *Id.*, PageID #2705–06. Plaintiffs' surprise evidence, by contrast, introduced a new damages calculation entirely.

*Importance of the evidence.* The district court determined that this factor was neutral because the undisclosed damages evidence was as important to Plaintiffs' case as it was prejudicial to Defendants'. That's only half right. The introduction of a legally invalid measure of damages cannot have been important to Plaintiffs' case. *See Moore v. Equitrans, L.P.*, 27 F.4th 211, 223 (4th Cir. 2022) (holding improper measure of damages is irrelevant as a matter of law). But presenting the jury with an inflated damage measure that accounts for the vast bulk of the overall recovery certainly prejudiced Defendants.

14

*Plaintiffs' explanation for their failure to disclose.* The conclusion that Plaintiffs had a sound explanation justifying the late disclosure rests on an error of fact and is therefore an abuse of discretion. *See United States v. Miller*, 115 F.3d 361, 365 n.5 (6th Cir. 1997). The court assumed that Defendants' own delay in producing the royalty reports lay behind Plaintiffs' failure to disclose. Not so. Fact discovery closed on August 19, 2018. Agreed Order, R. 59, PageID #68. By then, Plaintiffs had not complained that they lacked the documents they had requested, and they never moved to compel. Three years later, and just a few months before trial, Plaintiffs informed Defendants that they had not received some of the royalty reports they requested. Defendants immediately complied, producing the documents sometime before August 31, 2021—well in advance of the November trial. *See* Plaintiffs' List of Trial Exhibits, R. 109, Page ID #1181. Still, Plaintiffs never supplemented their disclosures.

Plaintiffs' brief mentions none of this. It elides completely that Plaintiffs had the royalty reports for three months before trial, that they clearly had a plan for how they would use them, that they did not even partially disclose that plan until the night before the close of their case, and that they did not fully disclose that plan until closing argument. That is sandbagging, pure and simple—the very tactic Rule 37(c) is supposed to prohibit.

15

## II.    This Court Should Vacate the Punitive Damages Award.

### A.    The Punitive Damages Instruction Omitted the Required "Clear and Convincing Evidence" Standard.

Plaintiffs agree that the district court's punitive-damages instruction applied the wrong standard of proof. Under long-standing Kentucky law, that failure is presumptively prejudicial, *Osborne v. Keeney*, 399 S.W.3d 1, 13 (Ky. 2012), and it warrants a new trial even under a plain error standard of review, *Eifler v. Greenamyer*, 2019 WL 2712618, at *8 (Ky. Ct. App. June 28, 2019). But according to House and the NPA, the district court's plainly erroneous instruction was actually Defendants' fault. That is incorrect.

Both sides asserted claims for punitive damages under Kentucky law. And it is true that in the joint proposed jury instructions, Defendants asked for a preponderance-of-the-evidence standard to be used in their instruction against Plaintiffs. *See, e.g.*, Proposed Jury Instructions, R. 116, PageID #1230. But the district court, recognizing that as error, changed the instruction to include a clear-and-convincing-evidence standard. Jury Instructions, R. 141, PageID #1484. By contrast, Plaintiffs' proposed punitive damages instruction against Defendants included the correct clear-and-convincing standard. R. 116, PageID #1303. But the district court removed it and added in its place the incorrect preponderance-of-the-evidence instruction. R. 141, PageID #1471.

Without saying so, Plaintiffs have effectively asked the Court to make a finding of invited error. In the context of erroneous jury instructions, this Court has held that an error is invited if, for example, the defendant affirmatively stipulates to the instruction against him. *United States v. Barrow*, 118 F.3d 482, 491 (6th Cir. 1997). That is not what happened here. Rather, the parties submitted a correct jury instruction to be used against Defendants, and the district court unfortunately changed it to include an incorrect standard.

That the parties unrelatedly submitted wrong instructions to be used against Plaintiffs, which the court corrected, is only relevant to the extent that it proves the court was aware of the correct standard and simply made a mistake, albeit a reversible one. *Harrod Concrete & Stone Co. v. Melton*, 2007 WL 3121282, at *4 (Ky. Ct. App. Oct. 26, 2007).[3]

Alternatively, Plaintiffs ask this Court to find in the first instance that the evidence presented at trial proves, by clear and convincing evidence, that Defendants acted with enough "oppression, fraud, or malice" to warrant punitive damages under KRS § 411.184. For support, they cite *Anderson v. Wade*, 33 F. App'x 750, 759 (6th Cir. 2002), in which the Court affirmed a punitive damage award, despite an incorrect jury instruction, because it

---

[3] If anything, this shows that Defendants should prevail even under invited-error doctrine, which "does not foreclose relief when the interests of justice demand otherwise." *Barrow*, 118 F.3d at 491.

believed "there was clear and convincing evidence in the record" showing the defendants deserved to be punished. But *Anderson* is a nonprecedential case that appears at odds with more recent Kentucky law, *see Eifler*, 2019 WL 2712618, at *8, as well as this Court's long-standing rule that such factual determinations are "for the jury, not this Court." *Gregory v. City of Louisville*, 444 F.3d 725, 759 n.14 (6th Cir. 2006); *see also United States v. Ramamoorthy*, 949 F.3d 955, 963 (6th Cir. 2020) ("Courts of appeal are not equipped to decide factual questions in the first instance").

To illustrate why this is so, it is worth considering one of the facts that, according to Plaintiffs, warrants punitive damages. Plaintiffs contend that "[a]t trial, the Newtons were evasive and dishonest about Throw Smart and their involvement in the company." Appellees Br. at 32. They urge the Court to find that "such dishonest, deceitful, and fraudulent conduct . . . constitutes clear and convincing, if not conclusive, evidence sufficient to support the jury's award of punitive damages under KRS 411.184." *Id.* at 32–33. In other words, Plaintiffs ask this Court to make a witness credibility determination based on a paper record. That is something courts of appeals cannot do. *See United States v. Owusu*, 199 F.3d 329, 344 (6th Cir. 2000) ("[W]e do not make credibility determinations in evaluating the sufficiency of evidence").

18

In any event, none of the evidence Plaintiffs highlight would warrant punitive damages. Defendants' failure to remove the marks from their website, without more, is insufficient to show a "reckless disregard for Plaintiffs' reputations, goodwill, and intellectual property rights," *see* Appellees' Br. at 32; if it were, punitive damages would be required in every state-law trademark case.

Nor can evidence concerning Joseph's formation of Throw Smart, LLC (the new company used to carry out the parties' agreement regarding the liquidation of ball kits), justify a punitive damages award. Appellees' Br. at 32. The lone exhibit Plaintiffs cite in support of the argument *was not offered at trial* but was merely appended to Plaintiffs' motion for attorneys' fees. R. 172-3. How could the jury have relied on a non-existent exhibit to sustain punitive damages? Moreover, as noted above, Joseph's testimony on the subject was excluded by the district court. Mem. Op., R. 184, PageID #3650 (quoting Tr., R. 155, PageID #1979–96).

## B.    Plaintiffs Decline to Respond to the Argument that the Punitive Damages Award Is Constitutionally Excessive.

Rather than offer any argument in support of the validity of the punitive damages award under the Excessive Fines Clause, Plaintiffs merely "reference and incorporate" the district court's reasoning. But parties are not permitted on appeal simply to incorporate district court documents by reference as a stand-

in for substantive argument. *Haynes v. McCalla Raymer, LLC*, 793 F.3d 1246, 1250 (11th Cir. 2015) ("[W]e will not consider any arguments a party attempts to incorporate by reference to filings in the district court"); *Davis v. O'Connor*, 812 F. App'x 659, 660 (9th Cir. 2020) ("We do not consider arguments incorporated by reference into the briefs"). And in any case, the district court's decision to compound the state punitive damages award by bundling the $1 common-law infringement recovery with damages awarded under the Lanham Act directly undermines Congress's decision to disallow punitive awards for federal trademark violations. This Court should reverse that error.

## III. House Breached the Contract First.

House was awarded contract damages even though the undisputed facts show that he breached first. Yet again, Plaintiffs seek to salvage that unjust outcome by appealing to technicalities.

Even assuming the first-breach argument isn't preserved for *de novo* review even though it was raised in Defendants' motion for a directed verdict, Defendants still prevail under a plain-error standard. An error is plain when it is obvious, affects substantial rights, and seriously affects the fairness or integrity of judicial proceedings. *Johnson v. United States,* 520 U.S. 461, 466–67 (1997).

20

First, the error was obvious. House knew Jamie Evans was writing PAJTT programs without authorization, using "the same basic protocol that Joseph was doing here in Kentucky." Tr., R. 159, PageID #2457. He was also aware of other "suspected attempts by third parties" to market knock-off versions of PAJTT, License Agreement, R. 51-1, PageID #514, including companies whose marketing materials made overt references to the Delabar story and the HBO special, Tr., R. 155, PageID #2026–27; 6/2/2015 Email, R. 51-8, PageID #581; Tr., R. 161, PageID #2660; 11/4/2014 Email, R. 51-6; 11/8/2014 Email, R. 51-7.

House testified that he made no effort to serve notice on Evans that he needed to obtain a distributorship agreement with Players' Dugout, as the contract expressly requires. R. 159, PageID #2458. And he admitted that, with the possible exceptions Gardy O'Flynn and Corey Ishigo, he never attempted to contact any of the other suspected copycats. *Id.*, PageID #2486–88. He simply *assumed* that they couldn't be pirating the program because he didn't personally teach them how to do it.

Further, no party disputes that House's breach predated Players' Dugout's missed royalty payments. [4]

---

[4] Joe testified that when Players' Dugout ceased making royalty payments on advice of counsel, they deposited monthly royalty checks in a specially created account designated, "The Players' Dugout, Inc., Tom House for royalties." R.

Second, the error impaired Defendants' substantial rights because it "affected the outcome of the district court proceedings." *United States v. Olano*, 507 U.S. 725, 734 (1993). Had the court granted judgment as a matter of law on Defendants' contract claim, Players' Dugout could not have been held liable for breach. *Nash-Finch Co. v. Casey's Foods, Inc.*, 762 F. App'x 218, 222 (6th Cir. 2018) ("The party first breaching a contract cannot complain if the other party thereafter refused to perform"). What's more, Defendants would be entitled to recover the full amount specified in the contract's liquidated damages clause. *See* Jury Instructions, R. 141, PageID #1452.

Third, the ruling seriously affects the fairness or integrity of judicial proceedings. *Olano*, 507 U.S. 726. The manifest injustice of allowing House to collect damages for breach of a contract from which he profited hundreds of thousands of dollars while making zero good-faith effort to perform his own contractual obligations is harmful to the "public reputation of judicial proceeding[s]." *Id.*

Plaintiffs' contrary arguments amount to little more than tedious hair-splitting. Start with their broad-brush assertion that Defendants "fail to identify any evidence" of "'known or suspected' third parties pirating the program."

155, PageID #1927. Plaintiffs' assertion to the contrary, Appellees' Br. at 4, is inaccurate.

22

Appellees' Br. at 36. Here's a list of just some the suspected offenders

Defendants brought to House's attention:

- VeloCity (Jamie Evans)

- Driveline Baseball (Kyle Boddy)

- The ARMory (Randy Sullivan)

- South Florida Rehab (Gabriel Carvajal)

- Eric Munson Baseball (Eric Munson)

- Diamond Pros Baseball (Mike Trott)

- Hit & Run Baseball (John Welton)

- Tri-State Elite Baseball Academy (Shane Schellsmidt)

- Complete Game

- Bio Pitch (Greg Short)

- Miami Pro Instruction

- Tommy Boss

- Gardy O'Flynn

*See* 11/4/2014 Email, R. 51-6; 11/8/2014 Email, R. 51-7; 6/2/2015 Email, R.

51-8.

PDI identified each of the names on that list as "known or suspected"

third parties within the meaning of the contract's "Piracy" provision.

House contacted just one (O'Flynn), and has attempted to account for why he didn't contact two others—Evans and Driveline. Appellees' Br. at 37–38, 41. As for the rest, House makes no attempt to justify his inaction beyond the glib assertion that no one can pirate PAJTT if he didn't personally teach them how to use it. *Id.* at 41. That post-hoc rationalization doesn't square with House's own concerns, expressed immediately before entering the exclusive contract with PDI, about the "need to go after . . . people that were trying to do the program or pirating the program." Tr., R. 153, PageID #1847.

Nor is there any merit to House's broad-brush assertion that the parties suspected by PDI were merely offering "generic training" with weighted balls. Appellees' Br. at 40. Defendants sent House documentation, including links to websites, showing that at least some of those suspected pirates were purporting to replicate the very training that saved Delabar's career. *See* 11/4/2014 Email, R. 51-6; 6/2/2015 Email, R. 51-8.[5]

Still less persuasive is House's excuse for not contacting Jamie Evans. House admitted that he taught Evans how to use the program. R. 159, PageID #2486. And he even expressed a personal desire to stop Evans from using

---

[5] Plaintiffs' allusion to a form cease-and-desist letter prepared by House's patent lawyer is disingenuous. The letter never mentions PDI as the exclusive distributor for PAJTT, nor does it demand that suspected offenders cease and desist from doing anything. App. 28.

PAJTT. R. 153, PageID #1847. But when pressed on why he never did so, House offers a two-fold rationalization. First, he says there was no evidence "that Evans was marketing and selling his program as the 'PATT Program' [sic] or a program developed by Tom House." Appellees' Br. at 42. Second, he says that "Evans was not following, and never did follow, the proper protocols or otherwise administer the PAJTT program as designed." *Id.* at 41. So in House's view, the contract only required him to police piracy if: (1) the offender doesn't attempt to conceal the piracy at all, instead publicly claiming an endorsement from House; (2) the offender was personally trained to use PAJTT by Tom House; and (3) the offender exercised the most exacting standards of fidelity to House's prescribed protocol. That is an absurd reading of the contract; if it were true, Players' Dugout effectively received nothing in exchange for its payment of royalties to House.

## IV. The Court Should Have Instructed the Jury to Consider Whether House Was Personally Liable for Defamation.

### A. House Ratified Adornato and Marney's Defamatory Statements.

In October 2015, Alex Marney sent out an email, appearing to be written and signed by House, that introduced Gary Adornato as the NPA's new chief executive and asked Adornato to "say a few words." R. 51-10, PageID #597–98. The jury found that the words Adornato said defamed PDI and the Newtons. At trial, House denied writing the email and testified that he only

25

became aware of it after the fact. But even when he did become aware of the defamatory words published in his name and on his behalf, House refused to retract them. R. 159, PageID #2385. Nevertheless, the court refused to include House in the defamation instruction or issue a ratification instruction against him. That was error.

Plaintiffs once again rely on a hypertechnical argument to avoid liability on this counterclaim: they assert the actions of an agent can only be ratified by the principal and that, in this case, Adornato and Marney were the agents of the NPA only, *not* House, its owner (on whose behalf they were speaking). So according to Plaintiffs, the court was correct to hold only the NPA, and not House, accountable for the defamation.

That simplistic account gets several things wrong. For starters, it is not true that actions taken by an employee can only ever be ratified by an employer. "Ratification is the affirmance of a prior act done by another, whereby the act is given effect as if done by an agent acting with actual authority." Restatement (Third) Of Agency § 4.01(1) (2006).[6] In other words, ratification occurs when an act is adopted *as if* it had been done by a genuine agent of the one adopting it. When a third party engages in defamation on a

---

[6] Kentucky courts follow the Restatement's definition of ratification. *Pannell v. Shannon*, 425 S.W.3d 58, 83 (Ky. 2014) ("ratification 'retroactively creates the effects of actual authority'" (quoting Restatement (Third) of Agency § 4.01)).

person's behalf, failure to repudiate the defamatory statements "justifies a reasonable assumption" that the person "assent[s] that the act shall affect the person's legal relations." *Id.* at § 4.01(2); *see, e.g.*, *Dickinson v. Cosby*, 250 Cal. Rptr. 3d 350, 361 (2019) (Bill Cosby "implicitly approved" defamatory press statements prepared on his behalf by his failure to retract them); *Pennsylvania Iron Works Co. v. Henry Vogt Mach. Co.*, 96 S.W. 551 (Ky. 1906).

Moreover, "[a] person may ratify an act if the actor acted or *purported to act* as an agent on the person's behalf." Restatement (Third) Of Agency § 4.03. That is precisely what happened here. Adornato and Marney published an email in House's name and purportedly on his behalf. R. 51-10, PageID #598. House never retracted the concededly false statement, which ultimately destroyed PDI's business. R. 159, PageID #2395–96. That failure to retract is "conduct that justifies a reasonable assumption" of his consent to it. Restatement (Third) Of Agency § 4.01(2).

Because the proposed ratification instruction was a correct statement of the law, it should have been given. This Court should reverse.

### B. House Is Liable for Slander *Per Se*.

Finally, Plaintiffs argue that Defendants failed to preserve their request for a slander *per se* instruction against House. That contention is meritless. Defendants requested the instruction repeatedly and objected to its exclusion

from the final instructions. *See, e.g.*, Tr., R. 162, PageID #2907, 2913, 2921–22. That they didn't raise the issue again in the JNOV motion is irrelevant. Requests for jury instructions are governed by Rule 51, not Rule 50. As such, "[i]t is not necessary for a party to move for a new trial or for judgment as a matter of law after the verdict is delivered in order to raise on appeal the propriety of instructions to the jury." 9C Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* §2258 (3d ed. 2022).

As for the merits, Plaintiffs raise two arguments against a slander *per se* instruction. The first is that House denied making the defamatory statements identified in Bill Schopp's testimony. Appellees' Br. at 49. But whether that denial was credible "is a question for the jury, not for the court." *United States v. Moreno*, 899 F.2d 465, 469 (6th Cir. 1990). Second, Plaintiffs assert that "*the evidence <u>indisputably</u> showed, and Defendants all but conceded, that **they suffered no injury . . . as a result of the alleged statement**.*" Appellees' Br. at 49 (emphasis in original). That argument is a red herring. The entire point of a defamation *per se* claim is that "damages are presumed and the person defamed may recover without allegation or proof of special damages." *Disabled American Veterans v. Crabb*, 182 S.W.3d 541, 547 (Ky. Ct. App. 2005). That presumption is "conclusive," not rebuttable. *Id.*; *Wieland v. Freeman*, 2022 WL 816964, at *5

28

(Ky. Ct. App. Mar. 18, 2022) (defamation *per se* entails a "a conclusive presumption of both malice and damage").

## CONCLUSION

For the foregoing reasons, the Court should (1) reverse the district court's denial of Defendants' motion for judgment as a matter of law as to the contract claims; (2) vacate the district court's award of profits to Plaintiffs under the Lanham Act; (3) vacate the district court's award of punitive damages for Plaintiffs' state-law trademark and unfair-competition claims; and (4) remand for a new trial on the following four issues: (a) the amount of profits due under the Lanham Act; (b) the correct measure of punitive damages for Defendants' state-law trademark and unfair-competition claims; (c) whether House ratified the NPA's defamatory email communication; and (d) whether House is personally liable for slander *per se*.

Respectfully submitted,

*/s/ Michael P. Abate*
Michael P. Abate
Burt A. (Chuck) Stinson
KAPLAN JOHNSON ABATE & BIRD LLP
710 West Main Street, 4th Floor
Louisville, KY 40202
Tel: (502) 416-1630
mabate@kaplanjohnsonlaw.com
cstinson@kaplanjohnsonlaw.com

### CERTIFICATE OF COMPLIANCE

I certify that the foregoing document complies with Fed. R. App. P.

32(a)(5) and 32(a)(7)(B) because it was prepared using Calisto MT 14-point

type and contains 6,475 words.

s/ Burt A. Stinson
*Counsel for Appellants*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 24, 2023, I filed a copy of the foregoing

brief and served it on all parties by filing it through the Court's CM/ECF

System. Counsel for all parties are registered ECF users.

s/ Burt A. Stinson
*Counsel for Appellants*

**ADDENDUM**

The following are hereby designated as relevant documents from the trial

court record:

| Record No. | Description | Page ID |
|---|---|---|
| 31 | Proposed Agreed Order | 172 |
| 39 | Amended Complaint | 240, 242, 244-45 |
| 51-1 | Adornato Letter | 514 |
| 51-6 | 11/4/2014 Email | 579 |
| 51-7 | 11/8/2014 Email | 580 |
| 51-8 | 6/2/2015 Email | 581 |
| 51-10 | NPA Email | 597-98 |
| 59 | Agreed Order | 68 |
| 109 | Plaintiffs' List of Trial Exhibits | 1181 |
| 116 | Proposed Jury Instructions | 1230, 1303 |
| 141 | Jury Instructions | 1452, 1453, 1464, 1471, 1484 |
| 153 | Transcript Vol. II | 1727-28, 1836, 1847 |
| 155 | Transcript Vol. III | 1927, 1979-96, 2026-27 |
| 159 | Transcript Vol. V | 2385, 2395-96, 2457, 2458, 2486–88 |
| 161 | Transcript Vol. VI | 2548, 2660, 2702, 2705-06, 2716, 2723, 2763, 2786, 2689–90 |
| 162 | Transcript Vol. VII | 2907, 2913, 2921–22 |
| 166 | Transcript Vol. VIII | 3088, 2995 |
| 170-1 | JNOV Motion | 3207 |
| 172-3 | Exhibit B to Plaintiffs' Fee Motion | 3368 |
| 181 | Reply in Support of JNOV Motion | 3564 |
| 184 | Mem. Op. | 3650 |